466 So.2d 856 (1985)
Glenn HALL, Husband of Terry O. Hall, Deceased
v.
Glyn R. HILBUN, M.D.
No. 53784.
Supreme Court of Mississippi.
February 27, 1985.
*859 Alfred Lee Felder, McComb, for appellant.
Joe R. Colingo, Pascagoula, George F. Bloss, III, Gulfport, Bryant & Stennis, Pascagoula, Gulfport, for appellee.
EN BANC.
*860 ROBERTSON, Justice, for the Court:

I.
This matter is before the Court on Petition for Rehearing presenting primarily the question whether we should, as a necessary incident to a just adjudication of the case at bar, refine and elaborate upon our law regarding (a) the standard of care applicable to physicians in medical malpractice cases and (b) the matter of how expert witnesses may be qualified in such litigation. We greatly expanded the old locality rule in King v. Murphy, 424 So.2d 547 (Miss. 1982). Experience and reason suggest that further refinements are necessary and in the interest of justice, generally and in this case.
When this matter was before the Court on direct appeal, we determined that the judgment below in favor of the surgeon, Dr. Glyn R. Hilbun, rendered following the granting of a motion for a directed verdict, had been correctly entered, two justices dissenting and two justices concurring specially. That result was perceived as required under our old locality rule, pre-King variety, pursuant to which the plaintiff's offer of the expert testimony of two eminently qualified physicians from Cleveland, Ohio, had been excluded.
For the reasons set forth below, we now regard that our original decision was incorrect. The opinion formally released on November 9, 1983, is withdrawn and instead thereof the instant opinion is substituted. The judgment of the Circuit Court is vacated and this case is remanded for a new trial on all issues.

II.
Terry O. Hall was admitted to the Singing River Hospital in Jackson County, Mississippi, in the early morning hours of May 18, 1978, complaining of abdominal discomfort. Because he was of the opinion his patient had a surgical problem, Dr. R.D. Ward, her physician, requested Dr. Glyn R. Hilbun, a general surgeon, to enter the case for consultation. Examination suggested that the discomfort and illness were probably caused by an obstruction of the small bowel. Dr. Hilbun recommended an exploratory laporatomy. Consent being given, Dr. Hilbun performed the surgery about noon on May 20, 1978, with apparent success.
Following surgery Mrs. Hall was moved to a recovery room at 1:35 p.m., where Dr. Hilbun remained in attendance with her until about 2:50 p.m. At that time Mrs. Hall was alert and communicating with him. All vital signs were stable. Mrs. Hall was then moved to a private room where she expired some 14 hours later.
On May 19, 1980, Glenn Hall commenced this wrongful death action by the filing of his complaint (nee declaration) in the Circuit Court of Jackson County, Mississippi. Named as defendants were Glyn R. Hilbun, M.D., and the Singing River Hospital, its administrator and several then unknown nurses.
This action was called for trial on July 13, 1981. Prior to that time all defendants with the exception of Dr. Hilbun had been dismissed.[1] Not only was Dr. Hilbun the sole defendant at trial, he is the sole appellee here.
At trial Glenn Hall, plaintiff below and appellant here, described the fact of the surgery. He then testified that he remained with his wife in her hospital room from the time of her arrival from the recovery room at approximately 3:00 p.m. on May 20, 1978, until she ultimately expired at approximately 5:00 a.m. on the morning of May 21. Hall stated that his wife complained of pain at about 9:00 p.m. and was given morphine for relief, after which she fell asleep. Thereafter, Hall observed that his wife had difficulty in breathing which he reported to the nurses. He inquired if something was wrong and was told his *861 wife was all right and that such breathing was not unusual following surgery. The labored breathing then subsided for an hour or more. Later, Mrs. Hall awakened and again complained of pain in her abdomen and requested a sedative, which was administered following which she fell asleep. Mrs. Hall experienced further difficulty in breathing, and her husband reported this, too. Again, a nurse told Hall that such was normal, that patients sometimes make a lot of noise after surgery.
After the nurse left the following occurred, according to Hall.
[A]t this time I followed her [the nurse] into the hall and walked in the hall a minute. Then I walked back into the room, and walked back out in the hall. Then I walked into the room again and I walked over to my wife and put my hand on her arm because she had stopped making that noise. Then I bent over and flipped the light on and got closer to her where I could see her, and it looked like she was having a real hard problem breathing and she was turning pale or a bluish color. And I went to screaming.
Dr. Hilbun was called and came to the hospital immediately only to find his patient had expired. The cause of the death of Terry O. Hall was subsequently determined to be adult respiratory distress syndrome (cardio-respiratory failure).
Dr. Hilbun was called as an adverse witness and gave testimony largely in accord with that above. He stated Dr. Ward requested consultation concerning Mrs. Hall's illness. He related that his diagnosis of a blocked intestine was correct, as revealed by the surgery, and that the surgery was a success. He testified that a surgeon operating in the Singing River Hospital was assisted by the nurses in the surgical ward who were on duty at the time, and that he had no option in their selection, had no way of knowing their qualifications, but did assume they were competent because they were selected by the hospital for duty in the surgical ward.
Dr. Hilbun stated the surgery was performed on a Saturday. Following the patient's removal to her room, he "went home and was on call that weekend for anything that might come up." Dr. Hilbun made no follow-up contacts with his patient, nor did he make any inquiry that evening regarding Mrs. Hall's post-operative progress. Moreover, he was not contacted by the nursing staff or others concerning Mrs. Hall's condition during the afternoon or evening of May 20 following surgery, or the early morning hours of May 21, although the exhibits introduced at trial disclose fluctuations in the vital signs late in the evening of May 20 and more so, in the early morning hours of May 21. Dr. Hilbun's next contact with his patient came when he was called by Glenn Hall about 4:55 or 5:00 that morning. By then it was too late.
Ironically, during those early morning hours of May 21, Dr. Hilbun was called by a member of the nursing staff concerning a patient who was in a room adjoining Mrs. Hall's, but Dr. Hilbun was not advised of Mrs. Hall's condition and apparently he did not inquire.
The autopsy performed upon Mrs. Hall's body revealed the cause of death and, additionally, disclosed that a laporatomy sponge had been left in the patient's abdominal cavity. The evidence, however, without contradiction establishes that the sponge did not contribute to Mrs. Hall's death. Although the sponge may ultimately have caused illness, this possibility was foreclosed by the patient's untimely death.
Plaintiff's theory of the case centered around the post-operative care provided by Dr. Hilbun. Two areas of fault suggested were Dr. Hilbun's failure to make inquiry regarding his patient's post-operative course prior to his retiring on the night of May 20 and his alleged failure to give appropriate post-operative instructions to the hospital nursing staff.
When questioned at trial, Dr. Hilbun first stated that he had practiced for 16 years in the Singing River Hospital and was familiar with the routine of making surgical notes, i.e., a history of the surgery. *862 He explained that the post-operative orders were noted on the record out of courtesy by Dr. Judy Fabian, the anesthesiologist on the case. He stated such orders were customarily approved by his signature or he would add or subtract from the record to reflect the exact situation.
Dr. Hilbun was asked to read the post-operative orders as noted on May 20, 1978. In pertinent part, his response follows:
Q. Okay, is that done in a shorthand form?
A. To RR; that means to recovery room.
Q. Okay.
A. That is an accepted abbreviation. All right, (2) vital signs every fifteen minutes until stable, then hourly times four, then routinely. (3) NPO. That means nothing by mouth. (4) Intake and output.
Q. Just a second. Intake and output; what does that particular order mean?
A. This woman has a levin tube in, and she has a Foley catheter in her bladder. She has I.V.s in her arm. We like to know exactly how much is going in and how much is coming out so we can keep up with her fluid balance. She is not going to be eating for several days.
Q. The tube is going down her nose, where was that tube going to?
A. To her stomach.
Q. Into her stomach. And what were the other two tubes that she had now?
A. She had a Foley catheter. That's a catheter in your bladder. It is put there for several reasons. One is to keep up with the intake and output; the other is to get the bladder out of the way, because you don't want to operate on someone with a full bladder and have the bladder in the way.
Q. Okay, is there another tube in her with intravenous fluids?
A. I.V. fluids; yes.
Q. So the I & O abbreviation there is to keep up with the intake and output?
A. Right.
Q. Okay, go to the next one.
A. Hemoglobin and (inaudible) in the morning. That is a blood count the next morning.
Q. That was to be done on the 21st; the next morning?
A. Right. (6) Bed rest. Ambulate in a.m. That means to get her up and walk her in the morning. As I mentioned before, nasogastric tube  the tube from your nose to your stomach. We scope to suction. That's to keep the stomach empty.
Q. So the jury will understand later, that is again abbreviated N-G?
A. N-G tube. That's the common abbreviation. Okay, insert Foley catheter. We have talked about the Foley catheter. Run D-5 (inaudible) at 125 c.c.'s per hour.
Q. Would you explain what that means, please?
A. Okay. That's I.V. fluids. Okay, we run at 125 cc's per day. If you ran 100 cc's per hour and you had ten of those, that would be a ten hour bottle. So this is going to run less than ten hours. We will say around seven hours, or something like that. We know we can regulate it. We have a cc dropper. We know exactly how many cc's drops in per hour. We know how much fluid is going in per hour.
Q. Okay. And the next order?
A. The post-operative medication that we give for pain is morphine, 10 milligrams; that is a unit of measurement. And Phenergan, which is 25 milligrams. Phenigan is a kind of an anahistamene [sic] tranquilizer, anti-nausea to keep you from vomiting. If you add it with the morphine, it really cuts down the vomiting and post-operative nausea. This is to be given i.m.  in the muscle  every four hours as needed for pain. The next one 
Q.  One moment before you go on. That simply means when the patient is in pain she can have that intra-muscular, but no more often than every four hours?
A. Right.

*863 Q. Okay, go ahead.
A. If she doesn't need it, she doesn't have to have it. The next one is number 12, Keflin, which is antibiotic, 1 gram I.V. every six hours.
Q. The morphine now was for pain?
A. Right.
Q. What was the second medication?
A. Phenergan.
Q. That is to help her sleep?
A. That's an anti-nausea.
Q. And the Keflin, what was the reason for that?
A. Some physicians like to give prophylactic antibiotics after a serious operation or major surgery; some don't. I'm from the school that I had rather prevent an infection before it gets there, than have to start treating it after it gets wound up and everything.
Q. Keflin is an antibiotic that is used with great regularity in the hospitals, especially with post-surgery; is that right?
A. Right.
Q. Now after this surgery, while Mrs. Hall was in the recovery room did I understand you to say earlier that you checked on her there?
A. When I got through operating on Mrs. Hall, with this major surgical procedure in an emergency situation  and I always do  I went to the recovery room with Mrs. Hall, stayed in the recovery room with Mrs. Hall, listened to her chest, took her vital signs, stayed there with her and discharged her to the floor. The only time I left the recovery room was to go into the waiting room and tell Mr. Hall. Mrs. Hall waked up, I talked to her, she said she was cold. She was completely alert.
...
Q. Now, you went to the recovery room to see her because you were still her physician following her post-surgery?
A. I was one of her physicians. I operated on her, and I go to the recovery room with everybody.
Q. Okay. You were the surgeon and you were concerned about the surgical procedures and how she was doing post-operatively, or either you are not concerned with your patients, how they do post-operatively?
A. As I said, I go to the recovery room with every one of my patients.
Q. Then you are still the doctor?
A. I was one of her physicians.
Q. Okay. And you customarily follow your patients following the surgery to see how they are doing as a result of the surgery, because you are the surgeon. Is that correct?
A. Yes.
...
Q. Let's talk about Terry Hall.
A. In the recovery room?
Q. All right. You followed her to the recovery room?
A. Yes, I sure did.
Q. Okay. Were you through with her after she came out of the recovery room?
A. No.
Q. How long do you follow a patient like Terry Hall?
A. Until she leaves the hospital.
Q. Okay. So ever how long she is in the hospital, you are going to continue to see her?
A. As long as my services are needed.
Insofar as the record reflects, Dr. Hilbun gave the nursing staff no instructions regarding the post-operative monitoring and care of Mrs. Hall beyond those detailed in his testimony quoted above. Dr. Hilbun had no contact with Mrs. Hall after 3:00 p.m. on May 20. Fourteen hours later she was dead.
The plaintiff called Dr. S.O. Hoerr, a retired surgeon of Cleveland, Ohio, as an expert witness. The record reflects that Dr. Hoerr is a cum laude graduate of the Harvard Medical School, enjoys the respect of his peers, and has had many years of surgical practice. Through him the plaintiff sought to establish that there is a national standard of surgical practice and surgical care of patients in the United States to which all surgeons, including Dr. Hilbun, *864 are obligated to adhere. Dr. Hoerr conceded that he did not know for a fact the standard of professional skill, including surgical skills and post-operative care, practiced by general surgeons in Pascagoula, Mississippi, but that he did know what the standard should have been.
Relying on Dazet v. Bass, 254 So.2d 183 (Miss. 1971), which at the time [July 13, 1981] was this Court's latest utterance on the subject of who may testify as an expert witness in a medical malpractice action, the trial court ruled that Dr. Hoerr was not qualified to give an opinion as to whether Dr. Hilbun's post-operative regimen departed from the obligatory standard of care. In his ruling the trial judge made the following statement:
I think the local rule [the locality rule] has been applied too restrictively in this state, and my basic belief is that it has got to be enlarged. But I don't believe our Supreme Court has gone that far and I personally don't think it can be applied nationally. Anyway, that is left up to the Supreme Court and I hope this case will help verify that.

Thereafter, the plaintiff made an extensive question and answer proffer of Dr. Hoerr's testimony.
Dr. David Peter Lango Sachs, also of Cleveland, Ohio, was offered by the plaintiff as a witness, and it appears that he was eminently qualified in his specialty of pulmonary diseases. He also was unfamiliar with the standard of care in Pascagoula, Mississippi, although well versed in the national standards. Dr. Sachs was not permitted to testify because of this court's ruling in Dazet v. Bass. An appropriate proffer of Dr. Sachs' testimony was made by plaintiff.
Parts of Dr. Hoerr's testimony excluded under the trial judge's ruling follow:
A. My opinion is that she [Mrs. Hall] did not receive the type of care that she should have received from the general surgical specialist and that he [Dr. Hilbun] was negligent in not following this patient; contacting, checking on the condition of his patient sometime in the evening of May 20th. It is important in the post-operative care of patients to remember that very serious complications can follow abdominal operations, in particular in the first few hours after a surgical procedure. And this can be inward bleeding; it can be an explosive development in an infection; or it can be the development of a serious pulmonary complication, as it was in this patient. As a result of her condition, it is my opinion that he lost the opportunity to diagnose a condition, which in all probability could have been diagnosed at the time by an experienced general surgeon, one with expertise in thoracic surgery. And then appropriate treatment could have been undertaken to abort the complications and save her life.

There are different ways that a surgeon can keep track of his patient  "follow her" as the expression goes  besides a bedside visit, which is the best way and which need not be very long at all, in which the vital signs are checked over. The surgeon gets a general impression of what's going on. He can delegate this responsibility to a competent physician, who need not be a surgeon but could be a knowledgeable family practitioner. He could call in and ask to speak to the registered nurse in charge of the patient and determine through her what the vital signs are, and if she is an experienced Registered Nurse what her evaluation of the patient is. From my review of the record, none of these things took place, and there is no effort as far as I can see that Dr. Hilbun made any effort to find out what was going on with this patient during that period of time. I might say or add an additional belief that I felt that the nursing responsibility which should have been exercised was not exercised, particularly at the 4:00 a.m. level when the pulse rate was recorded at 140 per minute without any effort as far as I can see to have any physician see the patient or to get in touch with the operating surgeon and so on.

*865 There is an additional thing that Dr. Hilbun could have done if he felt that the nursing services might be spotty  sometimes good, sometimes bad. This is commonly done in Columbus, Ohio, in Ashtabula, Pascagoula, etcetera. He could put limits on the degree in which the vital signs can vary, expressing the order that he should be called if they exceeded that. Examples would be: Call me if the pulse rate goes over 110; call me if the temperature exceeds 101; call me if the blood pressure drops below 100. There is a simple way of spelling out for the nursing services what the limits of discretion belong to them and the point at which the doctor should be called.
Q. Dr. Hoerr, the post-operative orders in the records that you have  I believe they are the yellow sheets toward the front. (Looking for order) Now, I have directed your attention to the post-operative orders of Dr. Hilbun, which have previously been identified by him as that. Have you had an opportunity to review the post-operative orders?
A. Yes, I have.
Q. Were there any orders in there at any place, or any other place in the records for that matter, in which Dr. Hilbun directed anyone to contact him if there were certain changes in vital signs?

A. Not that I could find. The answer is no. I couldn't see any there.

[emphasis added]
Dr. Hilbun did not place any orders on the chart for the nurses to call him in the event of a change in the vital signs of Mrs. Hall. He normally made afternoon rounds between 4:00 and 5:00 p.m. but didn't recall whether he went by to see her before going home. Dr. Hilbun was on call at the hospital that weekend for anything which might come up. Subsequent to the operation and previous to Mrs. Hall's death, he was called about one other person on the same ward, one door down, twice during the night. He made no inquiry concerning Mrs. Hall, nor did he see or communicate with her.
Dr. Donald Dohn, of expertise unquestioned by plaintiff and with years of practical experience, gave testimony for the defendant. He had practiced on the staff at the Cleveland Clinic Foundation in Cleveland, Ohio, beginning in 1958.[2] Fortuitously, he had moved to Pascagoula, Mississippi, about one month before the trial. Dr. Dohn stated he had practiced in the Singing River Hospital for a short time and there was a great difference in the standard of care in medical procedures in Cleveland, Ohio, and those in Pascagoula, Mississippi. Although he had practiced three weeks in Pascagoula, he was still in the process of acquainting himself with the local conditions. He explained the differences as follows:
Well, there are personnel differences. There are equipment differences. There are diagnostic differences. There are differences in staff responsibility and so on. For example, at the Cleveland Clinic on our service we had ten residents that we were training. They worked with us as our right hands. Here we have no staff. So it is up to us to do the things that our residents would have done there. There we had a team of five or six nurses and other personnel in the operating room to help us. Here we have nurses in the operating room, but there is no assigned team. You get the luck of the draw that day. I am finding out these things myself. Up there it is a big center; a thousand beds, and it is a regional center. We have tremendous advantages with technical systems, various types of x-ray equipment that is [sic] sophisticated. Also in terms of the intensive care unit, we had a Neurosurgical Intensive Care with people who were specially *866 trained as a team to work there. From my standpoint personally, I seldom had to do much paperwork there as compared to what I have to do now. I have to dictate everything and take all my notes. So, as you can see, there is a difference.
Finally, he again stated the standard of care in Ohio and the standard of care in the Singing River Hospital are very different, although it is obvious to the careful reader of Dr. Dohn's testimony that in so doing he had reference to the differences in equipment, personnel and resources and not differences in the standards of skill, medical knowledge and general medical competence a physician could be expected to bring to bear upon the treatment of a patient.
At the conclusion of the plaintiff's case, defendant moved for a directed verdict on the obvious grounds that, the testimony of Drs. Hoerr and Sachs having been excluded, the Plaintiff had failed to present a legally sufficient quantum of evidence to establish a prima facie case. The Circuit Court granted the motion and on July 17, 1981, final judgment was entered in favor of Defendant, Glyn R. Hilbun, and against Glenn Hall, husband of Terry O. Hall, the deceased.
In due course thereafter, Hall filed a motion for a new trial which on September 11, 1981, was overruled and denied. Hall then timely perfected his appeal to this Court.

III.

A. General Considerations

Medical malpractice is legal fault by a physician[3] or surgeon. It arises from the failure of a physician to provide the quality of care required by law. When a physician undertakes to treat a patient, he takes on an obligation enforceable at law to use minimally sound medical judgment and render minimally competent care in the course of the services he provides. A physician does not guarantee recovery. If a patient sustains injury because of the physician's failure to perform the duty he has assumed under our law, the physician may be liable in damages. A competent physician is not liable per se for a mere error of judgment, mistaken diagnosis or the occurrence of an undesirable result.
The twin principles undergirding our stewardship of the law regulating professional liability of physicians have always been reason and fairness. For years in medical malpractice litigation we regarded as reasonable and fair what came to be known as the "locality rule" (but which has always consisted of at least two separate rules, one a rule of substantive law, the other a rule of evidence).
First, under the locality rule, we have heretofore recognized as a rule of substantive law that a physician is bound to bestow to each patient such reasonable and ordinary care, skill, and diligence and to exercise such good medical judgment as physicians and surgeons in good standing in the same neighborhood or locality, in the same general line of practice, ordinarily have and exercise in like cases. Hill v. Stewart, 209 So.2d 809, 812 (Miss. 1968); DeLaughter v. Womack, 250 Miss. 190, 202, 164 So.2d 762, 766 (1964); Copeland v. Robertson, 236 Miss. 95, 110, 112 So.2d 236, 241 (1959).
Second, as a rule of evidence, we have heretofore held that, in addition to possessing all of the other qualities requisite for judicial acceptance as an expert witness generally, a medical expert would not be allowed to testify in a medical malpractice case unless he practiced in the neighborhood or locality and was familiar with the local standard of care. See Holmes v. Elliott, 443 So.2d 825, 827-833 (Miss. 1983); King v. Murphy, 424 So.2d 547, 549-550 (Miss. 1982).
Both "prongs" of the locality rule have fallen under attack in recent years. It is urged that the circumstances which have *867 given rise to the rules have passed out of existence. The practice of medicine in general and medical malpractice litigation in particular are said to have achieved a level sophistication that require a modernization of our law. There is merit in the attack. Suffice it to say that the rules we have heretofore employed do not seem nearly so consonant with reason and fairness as they once did.
Just over two years ago we recognized that all was not well in this troubled area of the law. In King v. Murphy, 424 So.2d 547 (Miss. 1982), we greatly expanded the concept of the "neighborhood or locality", within the contemplation of the substantive rule regulating the standard of care, to include geographically at least the entire state of Mississippi plus "a reasonable distance adjacent to state boundaries." 424 So.2d at 550. (emphasis added).
King also removed the geographical restrictions on the pool from which expert witnesses might be drawn by either adversary. King held that
an expert witness who is knowledgeable of, and familiar with, the statewide standard of care shall not have his testimony excluded on the ground that he does not practice in this state.

424 So.2d at 550 (emphasis added).
Under King an otherwise competent medical expert, say, from New York, would be eligible to testify if he had, prior to taking the witness stand, substantially familiarized himself with the standard of care in the (greatly enlarged) "locality or neighborhood".
Since King, the docket of this Court has continued to be supplied with medical malpractice cases, a number of which are pending at this time. In the light of these cases, and the excellent briefs and arguments we have received from counsel, several things are apparent:
First, King recognizes that the locality rule is not and has never been just one rule. King draws a distinction between the substantive rule of law governing the liability vel non of physicians and the rule of evidence regulating the appearance of expert witnesses. In this sense King establishes a satisfactory general framework within which to handle these cases in the future.
Second, regarding the substantive standard, reflection suggests that further refinement and clarification are necessary. More sharpness needs to be brought to the distinction between the level of care a physician may be expected to render by reference to his skill, knowledge, judgment and general competence, on the one hand, and that which may reasonably be expected by reference to the facilities, equipment, personnel and resources reasonably available to him in the course of treatment. On the point of reasonable availability of resources, there are great variances from rural to urban areas within the King-defined "locality or neighborhood". These need be taken into account. Further, for the sake of intellectual honesty, we should go ahead and state forthrightly what everyone who has read King surely knows: that the "locality or neighborhood" concept as we have heretofore known it has been obliterated.
Third, King's evidentiary rule regulating expert witnesses seems clear to us. The cases that have come before the Court since King, however, suggest that it is not wholly understood in some quarters.[4] On this point, we wish to make it clear that King means what it says: where a proffered medical expert lives or practices per se has no relevance to whether he may give expert opinion testimony at trial.

B. The Experience In Other States

Our law is not administered in isolation, any more than the physicians who practice in this state work in isolation from the rest of the country. We are not the first state to confront these problems.
*868 No doubt there was a time when all states embraced what has been simplistically denominated "the locality rule". Formulated over a hundred years ago to protect the rural and small town practitioner presumed to be less adequately informed and equipped than his colleague in the city the rule gradually came to hold sway throughout the country. See, e.g., Small v. Howard, 128 Mass. 131, 132, 35 Am.Rep. 363, 365 (1880); Smothers v. Hanks, 34 Iowa 286, 289-90, 11 Am.Rep. 141, 142-43, (1872).
Times have changed and perceptions of reality have changed. We now have a plethora of varying rules enforced among the fifty states in medical malpractice cases. Some states have opted for what has come to be known as the "national standard of care". See, e.g., Drs. Lane, Bryant, Eubanks & Dulaney v. Otts, 412 So.2d 254, 257-58 (Ala. 1982); Morrison v. MacNamara, 407 A.2d 555, 565 (D.C. 1979); Greenstein v. Meister, 279 Md. 275, 368 A.2d 451, 456-57 (1977); see also Martin v. Bralliar, 36 Colo. App. 254, 259, 540 P.2d 1118, 1121 (1975) (national standard applied to the facts in this case); Brune v. Belinkoff, 354 Mass. 102, 108-09, 235 N.E.2d 793, 798 (1968) (national standard modified by local facility limitations); Hart v. Steele, 416 S.W.2d 927, 931 (Mo. 1967) (same); Pederson v. Dumouchel, 72 Wash.2d 73, 79, 431 P.2d 973, 977-78 (1967) (same); cf. McCormack v. Lindberg, 352 N.W.2d 30, 36 (Minn. Ct. App. 1984) (national standard applied to specialists); Moultrie v. Medical University of South Carolina, 280 S.C. 159, 311 S.E.2d 730, 731 (1984) (same); Taylor v. Hill, 464 A.2d 938, 943 (Me. 1983) (same); Steinbach v. Barfield, 428 So.2d 915, 919-20 (La. Ct. App. 1983) (same); Wentling v. Jenny, 206 Neb. 335, 338-39, 293 N.W.2d 76, 79 (1980) (same); Orcutt v. Miller, 95 Nev. 408, 595 P.2d 1191, 1194-95 (1979) (same); Gaston v. Hunter, 121 Ariz. 33, 54-55, 588 P.2d 326, 346 (1978) (same); Simpson v. Davis, 219 Kan. 584, 587-88, 549 P.2d 950, 953-54 (1976); Bruni v. Tatsumi, 46 Ohio St.2d 127, 134-35, 346 N.E.2d 673, 679 (1976) (same); Kronke v. Danielson, 108 Ariz. 400, 403, 499 P.2d 156, 159 (1972) (same); Naccarato v. Grob, 384 Mich. 248, 253, 180 N.W.2d 788, 791 (1970) (same).
The law in other states has imposed a uniform statewide standard of care. See, e.g., Fitzmaurice v. Flynn, 167 Conn. 609, 617, 356 A.2d 887, 892 (1975); Ives v. Redford, 219 Va. 838, 842, 252 S.E.2d 315, 318 (1979).
Still other states have expanded the locality rule to require that a physician possess and exercise that degree of skill and care which a physician of ordinary prudence and skill, practicing in the same or a similar community, would have exercised in the same or similar circumstances.[5]See, e.g., Baylis v. Wilmington Medical Center, Inc., 477 A.2d 1051, 1057 (Del. 1984); Bartimus v. Paxton Community Hospital, 120 Ill. App.3d 1060, 76 Ill.Dec. 418, 424, 458 N.E.2d 1072, 1078 (1983); McPherson v. Ellis, 305 N.C. 266, 270, 287 S.E.2d 892, 895 (1982); Jenkins v. Parrish, 627 P.2d 533, 537 (Utah 1981); Priest v. Lindig, 583 P.2d 173, 176 (Alaska 1978); Chandler v. Neosho Memorial Hospital, 223 Kan. 1, 3-4, 574 P.2d 136, 138 (1977); Kortus v. Jensen, 195 Neb. 261, 269, 237 N.W.2d 845, 850 (1976); Gambill v. Stroud, 258 Ark. 766, 770-71, 531 S.W.2d 945, 948-49 (1976); Groffe v. Pharmaseal Laboratories, Inc., 90 N.M. 764, 767, 568 P.2d 600, 603-04 (1976); see also Haught v. Maceluch, 681 F.2d 291, 303 (5th Cir.1982) (applying Texas law).[6]
*869 Finally there are states which doggedly cling to the old locality rule. See, e.g., Campbell v. Oliva, 424 F.2d 1244, 1248 (6th Cir.1970) (applying Tennessee law).
We have carefully considered these and other cases together with the excellent briefs of counsel in this and several related cases now pending before the court. We hope that today's opinion will reflect that we have learned from the mistakes and experiences of others, as well as our own.
One mistake many have made has been the attempt to simplify that which is not so simple. Among such mistakes have been the pretention that the locality rule was a single rule, the use in a rule of the phrase "standard of care" accompanied at most by an amorphous formulation of that standard, and the adoption of a "national standard of care" without explaining what is meant thereby or taking account of the realities of the universe in which physician and patient interact. Courts seldom advance the cause of justice when they forge unrealistically simplistic rules to regulate subtly complex activities and enterprises. Such efforts create more problems than they solve.
In the analysis and formulations that follow, we seek clarity, which is not always synonymous with simplicity. We seek a sensitive accommodation of the legitimate interests, on the one hand, of those who have taken and take seriously the Oath of Hippocrates, and on the other hand, of those who seek and receive health care. By the same token, we hope that today's opinion will reflect that reason and fairness have subsumed passion and self-interest as the pillars upon which our rules of law ought to be based.

C. The Physician's Duty of Care: A primary rule of substantive law

1. The Backdrop

Each physician, by virtue of the positive, substantive law of this state, has a duty of care consistent with the level of expertise the physician holds himself out as possessing and consistent with the circumstances of the case. That duty is non-delegable. See Pharr v. Anderson, 436 So.2d 1357, 1361 (Miss. 1983). It is owing to each patient he or she undertakes to treat, and in that regard the patient has a correlative right. Injury caused by substantial violations of the physician's duty and the patient's right may subject the physician to tort liability.
Liability turns on a failure to provide the required level of care. It matters not whether this failure results from incompetence or negligence. Some of our cases have misleadingly stated that liability may result from either of two causes: "lack of skill or neglect to apply it if possessed". Dazet v. Bass, 254 So.2d 183, 186 (Miss. 1971); DeLaughter v. Womack, 250 Miss. 190, 202, 164 So.2d 762, 767 (1964); Newport v. Hyde, 244 Miss. 870, 875, 147 So.2d 113, 115 (1962). The matter is properly seen from the patient's point of view. Liability results from the physician's failure to provide requisite care under the circumstances, and nothing turns on whether this failure resulted from incompetence or neglect.
Our law has long focused upon the quality of care a physician's knowledge and skill may enable him to render. Repeatedly in our cases we find the statement that
a physician must possess that reasonable degree of learning, skill and experience which is ordinarily possessed by others in his profession.

Hill v. Stewart, 209 So.2d 809, 812 (Miss. 1968); DeLaughter v. Womack, 250 Miss. 190, 201-202, 164 So.2d 762, 766 (1964); Copeland v. Robertson, 236 Miss. 95, 110, 112 So.2d 236, 241 (1959).
In its modernization of our previous rule, King v. Murphy uses the same starting point. 424 So.2d at 549.
*870 The locality rule was superimposed upon this obviously valid general premise. We perceived physicians as more or less isolated in their local communities and held the level of care they were obligated to render was that generally prevailing in the community. By custom, physicians in each community were empowered to set the standards by which their professional conduct would be judged.

2. The Inevitable Ascendency of National Standards

In 1971, we faced a strong attack on the continuing validity and viability of the locality rule in Dazet v. Bass, 254 So.2d 183 (Miss. 1971). On that occasion we were advised
that physicians now attend the same colleges, receive the same post graduate courses in their specialities, and go to the same seminars, that the standards of care for a specialist should be and are the same throughout the country, and that geographical conditions or circumstances are no longer valid as controlling the standards of a specialist's care or competence.
254 So.2d at 187.
Though we rejected plaintiff's case on procedural grounds, we recognized in Dazet that the point has "considerable force". 254 So.2d at 187. The continued force of the point is evidenced by the step forward taken in King v. Murphy.
We would have to put our heads in the sand to ignore the "nationalization" of medical education and training. Medical school admission standards are similar across the country. Curricula are substantially the same. Internship and residency programs for those entering medical specialities have substantially common components. Nationally uniform standards are enforced in the case of certification of specialists. Differences and changes in these areas occur temporally, not geographically.
Physicians are far more mobile than they once were. They frequently attend medical school in one state, do a residency in another, establish a practice in a third and after a period of time relocate to a fourth. All the while they have ready access to professional and scientific journals and seminars for continuing medical education from across the country. Common sense and experience inform us that the laws of medicine do not vary from state to state in anything like the manner our public law does.
King v. Murphy represents a recognition by this Court of what has long been an established fact: that the medical centers in Memphis, Birmingham, Mobile, New Orleans and other nearby areas in adjoining states are a very real part of the Mississippi-centered universe of hospitalization, medical care and treatment and other health related services.
Medicine is a science, though its practice be an art (as distinguished from a business). Regarding the basic matter of the learning, skill and competence a physician may bring to bear in the treatment of a given patient, state lines are largely irrelevant. That a patient's temperature is 105 degrees means the same in New York as in Mississippi. Bones break and heal in Washington the same as in Florida, in Minnesota the same as in Texas. An abnormal blood sugar count should be interpreted in California as in Illinois as in Tennessee. A patient's physiological response to an exploratory laparotomy and needs regarding post-operative care following such surgery do not vary from Ohio to Mississippi. A pulse rate of 140 per minute provides a danger signal in Pascagoula, Mississippi, the same as it does in Cleveland, Ohio. Bacteria, physiology and the life process itself know little of geography and nothing of political boundaries.
It is absurd to think that a physician examining a patient in his or her office would, by reference to the genuine health care needs of the patient, say: Because I practice in Mississippi (or the Deep South), I will make this diagnosis and prescribe this medication and course of treatment, but if I were in Iowa, I would do otherwise. We are confident (as the medical community of this state is no doubt confident) that Mississippi's physicians are capable of rendering *871 and do in fact render a quality of care on a par with that in other parts of the country.

3. The Competence-Based National Standard Of Care: Herein Of the Limited Role Of Local Custom

All of the above informs our understanding and articulation of the competence-based duty of care. Each physician may with reason and fairness be expected to possess or have reasonable access to such medical knowledge as is commonly possessed or reasonably available to minimally competent physicians in the same specialty or general field of practice throughout the United States, to have a realistic understanding of the limitations on his or her knowledge or competence, and, in general, to exercise minimally adequate medical judgment. Beyond that, each physician has a duty to have a practical working knowledge of the facilities, equipment, resources (including personnel in health related fields and their general level of knowledge and competence), and options (including what specialized services or facilities may be available in larger communities, e.g., Memphis, Birmingham, Jackson, New Orleans, etc.) reasonably available to him or her as well as the practical limitations on same.
In the care and treatment of each patient, each physician has a non-delegable duty to render professional services consistent with that objectively ascertained minimally acceptable level of competence he may be expected to apply given the qualifications and level of expertise he holds himself out as possessing and given the circumstances of the particular case. The professional services contemplated within this duty concern the entire caring process, including but not limited to examination, history, testing, diagnosis, course of treatment, medication, surgery, follow-up, after-care and the like.
Emphasis is given the proposition that physicians incur civil liability only when the quality of care they render falls below objectively ascertained minimally acceptable levels. Use of such concepts as "average" are misleading and should be avoided, particularly in jury instructions, for such notions understood arithmetically suggest that the lower 50 percent of our physicians regularly engage in medical malpractice. We are confident that the percentage of physicians in this state who daily deliver to their patients a legally acceptable quality of care is quite high. The terminology we use, particularly in jury instructions, should reflect this reality.
Mention should be made in this context of the role of good medical judgment which, because medicine is not an exact science, must be brought to bear in diagnostic and treatment decisions daily. Some physicians are more reluctant to recommend radical surgery than are other equally competent physicians. There exist legitimate differences of opinion regarding medications to be employed in particular contexts. "Waiting periods" and their duration are the subject of bona fide medical controversy. What diagnostic tests should be performed is a matter of particularly heated debate in this era of ever-escalating health care costs. We must be vigilant that liability never be imposed upon a physician for the mere exercise of a bona fide medical judgment which turns out, with the benefit of 20-20 hindsight, (a) to have been mistaken, and (b) to be contrary to what a qualified medical expert witness in the exercise of his good medical judgment would have done. We repeat: a physician may incur civil liability only when the quality of care he renders (including his judgment calls) falls below minimally acceptable levels.
Different medical judgments are made by physicians whose offices are across the street from one another. Comparable differences in medical judgment or opinion exist among physicians geographically separated by much greater distances, and in this sense local custom does and must continue to play a role within our law, albeit a limited one.
We recognize that customs vary within given medical communities and *872 from one medical community to another. Conformity with established medical custom practiced by minimally competent physicians in a given area, while evidence of performance of the duty of care, may never be conclusive of such compliance. Cf. Helling v. Carey, 83 Wash.2d 514, 519 P.2d 981 (1974). The content of the duty of care must be objectively determined by reference to the availability of medical and practical knowledge which would be brought to bear in the treatment of like or similar patients under like or similar circumstances by minimally competent physicians in the same field, given the facilities, resources and options available. The content of the duty of care may be informed by local medical custom but never subsumed by it.
Conformity with a local medical custom may be one factor suggesting that a physician has fulfilled his obligation of care. On the other hand, failure to conform to an established medical custom regarding care will generally lead inescapably to the conclusion that the duty of care has been breached.

4. The Resources-Based Caveat to the National Standard of Care

The duty of care, as it thus emerges from considerations of reason and fairness, when applied to the facts of the world of medical science and practice, takes two forms: (a) a duty to render a quality of care consonant with the level of medical and practical knowledge the physician may reasonably be expected to possess and the medical judgment he may be expected to exercise, and (b) a duty based upon the adept use of such medical facilities, services, equipment and options as are reasonably available. With respect to this second form of the duty, we regard that there remains a core of validity to the premises of the old locality rule.
For reasons well known to all, the facilities, equipment, health care personnel, and other such resources reasonably available to Mississippi's physicians vary from community to community. Major differences exist between the tools the physician has to work within rural Mississippi as contrasted with our more urban areas. Generally speaking, the most comprehensive availability of sophisticated medical facilities and equipment in this state may be found in Jackson.
Because of these differences in facilities, equipment, etc., what a physician may reasonably be expected to do in the treatment of a patient in rural Humphreys County or Greene County may vary from what a physician in Jackson may be able to do. A physician practicing in Noxubee County, for example, may hardly be faulted for failure to perform a CAT scan when the necessary facilities and equipment are not reasonably available. In contradistinction, objectively reasonable expectations regarding the physician's knowledge, skill, capacity for sound medical judgment and general competence are, consistent with his field of practice and the facts and circumstances in which the patient may be found, the same everywhere.
One of the cases which started the present trend toward judicial abolition of the old locality rule, Pederson v. Dumouchel, 72 Wash.2d 73, 431 P.2d 973 (1967), perceived that the quality of care a physician was obligated to render should be consistent
with the medical and professional means available in those centers that are readily accessible for appropriate treatment of the patient.
431 P.2d at 978 (emphasis added).
Another such case, Brune v. Belinkoff, 354 Mass. 102, 235 N.E.2d 793 (1968), similarly permits consideration of "the medical resources available to the physician". 235 N.E.2d at 798.
Justice Hawkins spoke closer to home in his separate opinion in King:
... [S]mall town practitioners whose daily practice requires them to treat patients in what might be deemed less than ideal circumstances should not be penalized or obligated to ... utilize the same equipment of a medical specialist in a metropolitan hospital.
424 So.2d at 551 n. 1.
*873 As a result of its resources-based component, the physician's non-delegable duty of care is this: given the circumstances of each patient, each physician has a duty to use his or her knowledge and therewith treat through maximum reasonable medical recovery, each patient, with such reasonable diligence, skill, competence, and prudence as are practiced by minimally competent physicians in the same specialty or general field of practice throughout the United States, who have available to them the same general facilities, services, equipment and options.

5. King v. Murphy Revisited

When all that has been said above is considered, we today do little more than smooth some of the rough edges of King v. Murphy. King recognizes that, as a part of our law, the formulation of the duty of care is to be informed by standards of medical competence prevailing statewide in Mississippi "and for a reasonable distance adjacent to state boundaries". 424 So.2d at 550. This necessarily includes Memphis, Mobile and New Orleans at the very least. When the standards of medical practice prevailing in Jackson, Mississippi, are added, it may be seen that for all practical purposes King has embraced what many call the "national standard of care". Aside from highly specialized and in many instances still experimental services with respect to certain catastrophic diseases and medical problems, the quality of medical and health care in Memphis, Mobile, New Orleans and Jackson is consistent with that available anywhere in the land. The refinement of King we make on this score may be expected to eliminate legalistic debates over whether Birmingham, or Houston, or Nashville, or Atlanta is within "a reasonable distance adjacent to state boundaries". Past that it should have little practical effect.
On the other hand, we have added to King a pragmatic addendum by today's recognition that the physician's duty of care must take into consideration the quality and kind of facilities, services, equipment and other resources available. Nothing in King precluded consideration of this factor, which in reason and fairness ought to be a part of our law's approach to medical malpractice cases. Today we remove all doubt of the matter.[7]
As we deal with general principles, gray areas necessarily exist. One involves the case where needed specialized facilities and equipment are not available locally but are reasonably accessible in major medical centers  New Orleans, Jackson, Memphis. Here as elsewhere the local physician is held to minimally acceptable standards. In determining whether the physician's actions comport with his duty of care, consideration must always be given to the time factor  is the physician confronted with what reasonably appears to be a medical emergency, or does it appear likely that the patient may be transferred to an appropriate medical center without substantial risk to the health or life of the patient? Consideration must also be given to the economic factors  are the proposed transferee facilities sufficiently superior to justify the trouble and expense of transfer? Further discussion of these factors should await proper cases.

D. Who May Qualify As Expert Medical Witness In Malpractice Case: A rule of evidence

As a general rule, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education (or a combination thereof), coupled with independence and lack of bias, may testify thereto in the form of an opinion or *874 otherwise.[8] Medical malpractice cases generally require expert witnesses to assist the trier of fact to understand the evidence. Kilpatrick v. Mississippi Baptist Medical Center, 461 So.2d 765, 768 (Miss. 1984).
Generally, where the expert lives or where he or she practices his or her profession has no relevance per se with respect to whether a person may be qualified and accepted by the court as an expert witness. There is no reason on principle why these factors should have per se relevance in medical malpractice cases. This is the clear meaning of King v. Murphy wherein Justice Roy Noble Lee, speaking for the Court, wrote:
An expert witness ... shall not have his testimony excluded on the ground that he does not practice in this state.
424 So.2d at 550.
While the language of King is as clear as it can be, we are aware of two misinterpretations which have been given it among the bench and bar. First, some have read King as merely enlarging the pool of available medical expert witnesses to include those who geographically reside in areas adjacent to Mississippi. Physicians from Boston or Chicago or San Francisco would still be excluded as a matter of law. The place of professional residence of the expert, however, is of no relevance at all under King, so long as it is in this country. That the expert may hail from Oregon or Massachusetts or from Cleveland, Ohio, has no per se relevance.
Second, some have read King as requiring that the expert possess intimate knowledge of how things are done in the particular Mississippi medical facility in issue. King, however, expressly rejects the notion that a particular medical community or facility could by custom or agreement establish the standards by which a patient's malpractice action should be adjudged. King recognizes that in the area of medical knowledge, skill and competence there is a common minimally acceptable standard throughout a neighborhood or locality geographically defined as including this state and "for a reasonable distance adjacent to state boundaries." 424 So.2d at 550. The source of this standard (as refined in Subsection III(C) above) and the duty based upon it (as elaborated in Subsection III(C) above) is the positive law of the state, not medical custom. It is that minimum legal standard (to be sure, informed by customs) with which the expert must be familiar, yet we know that some lawyers argue and some trial judges read King quite differently.
What is really at issue here is whether we will treat medical expert witnesses the same as experts in other fields. The old locality rule and the misreading some have given King would add a geographical component. Though we regard the majority opinion in King as having clearly stated the rule, we are indebted to Justice Hawkins for reminding us persistently that there is no valid basis in judicial reason for not treating
the question of the competency of the testimony of physicians the same as any other expert.

Holmes v. Elliott, 443 So.2d 825, 833 (Miss. 1983) (Hawkins, J., specially concurring)
In view of the refinements in the physician's duty of care articulated in Subsection III(C) above, we hold that a qualified medical expert witness may without more express an opinion regarding the meaning and import of the duty of care articulated in Subsection III(C) above, given the peculiar circumstances of the case. Based on the information reasonably available to the physician, i.e., symptoms, history, test results, results of the doctor's own physical examination, x-rays, vital signs, etc., a qualified medical expert may express an opinion regarding the conclusions (possible diagnoses or areas for further examination and testing) minimally knowledgeable *875 and competent physicians in the same specialty or general field of practice would draw, or actions (not tied to the availability of specialized facilities or equipment not generally available) they would take.[9]
Before the witness may go further, he must be familiarized with the facilities, resources, services and options available. This may be done in any number of ways. The witness may prior to trial have visited the facilities, etc. He may have sat in the courtroom and listened as other witnesses described the facilities. He may have known and over the years interacted with physicians in the area. There are no doubt many other ways in which this could be done, but, significantly, we should allow the witness to be made familiar with the facilities (and customs) of the medical community in question via a properly predicated and phrased hypothetical question.
Once he has become informed of the facilities, etc. available to the defendant physician, the qualified medical expert witness may express an opinion what the care duty of the defendant physician was[10] and whether the acts or omissions of the defendant physician were in compliance with, or fell substantially short of compliance with, that duty.
At this point it is appropriate to note the earnestness with which counsel for Dr. Hilbun, no doubt purporting to speak on behalf of the medical community generally, begs for protection from the circuit-riding charlatan, the man from out of town with a briefcase.[11] The instrument with which they would have us afford this protection is too blunt. Justice Hawkins in this context has aptly observed:
It seems incongruous to me that a medical specialist from the Mayo Clinic, the Ochsner Clinic, the Menninger Foundation, or the Sloan-Kettering Institute could not express opinions within his field of knowledge on what constitutes good medical practice in any court in the United States, or on this entire planet, for that matter.

King v. Murphy, 424 So.2d 547, 552 (Miss. 1982) (Hawkins, J., dissenting)
We remind one and all that qualification of a medical expert witness in a malpractice action is no more a mechanical process than any other procedure in our law. Within the limits of the general rule stated above, the trial judge is necessarily called upon to exercise his sound discretion in determining whether a proffered witness is in fact qualified as an expert. See Pharr v. Anderson, 436 So.2d 1357, 1359 (Miss. 1983).
Our trial judges are admonished to ascertain that the witness really is an expert in the particular field at issue. Not every M.D. is a qualified expert in every malpractice case. Liberal cross-examination regarding bias, interest and previous experience as an expert in medical malpractice cases should be allowed both on voir dire and when the witness' testimony is being presented to the jury.

IV. The Rules We Announce Apply Retroactively

It is a general rule that judicially enunciated rules of law are applied retroactively. Legislation applies prospectively only, and we are not thought to be in the business of legislating. Rather, our function is to decide cases justly in accordance with sound legal principles which of necessity must be formulated, articulated and applied consistent with the facts of the case.
*876 Keyes v. Guy Bailey Homes, Inc., 439 So.2d 670 (Miss. 1983), abolishing the requirement of privity of contract in home construction contracts applied retroactively; Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454 (Miss. 1983), providing that punitive damages may be recovered in chancery court was applied retroactively; McDaniel v. State, 356 So.2d 1151 (Miss. 1978) overruling cases which allowed voluntary intoxication as a defense to a crime applied retroactively.
The general rule applied universally in this country in federal and state courts is simply put in Jones v. Thigpen, 741 F.2d 805 (5th Cir.1984).
"Judicial decisions ordinarily apply retroactively. See Robinson v. Neil, 409 U.S. 505, 507-08, 93 S.Ct. 876, 877-78, 35 L.Ed.2d 29 (1973). `Indeed, a legal system based on precedent has a built-in presumption of retroactivity. Solem v. Stumes, ___ U.S. ___, ___, 104 S.Ct. 1338, 1341, 79 L.Ed.2d 579 (1984)."
 741 F.2d at 810.
Even Pruett v. City of Rosedale, 421 So.2d 1046 (Miss. 1982), was held to apply retroactively to that case.
We note that other states, when shedding the "locality rule", have done so in a routine manner by simply adopting the new rule and applying it in a normal (retroactive) fashion without fanfare. See Zills v. Brown, 382 So.2d 528, 532 (Ala. 1980) applying this new rule retroactively in Drs. Lane, Bryant, Eubanks & Dulaney v. Otts, 412 So.2d 254, 256-8 (Ala. 1982) and May v. Moore, 424 So.2d 596, 597-601 (Ala. 1982); Jenkins v. Parrish, 627 P.2d 533, 537 n. 1 (Utah 1981) (rule to be applied retroactively); Orcutt v. Miller, 95 Nev. 408, 595 P.2d 1191, 1194-95 (1979) (new rule routinely applied); Ardoin v. Hartford Accident & Indemnity Co., 360 So.2d 1331, 1339 n. 22 (La. 1978) (overruling Percle v. St. Paul Fire & Marine Insurance Co., 349 So.2d 1289, 1303 (La. Ct. App. 1977), which had held abandonment of locality rule to be prospective only); Bruni v. Tatsumi, 46 Ohio St.2d 127, 134-35, 346 N.E.2d 673, 679 (1976) (new rule routinely applied); Kronke v. Danielson, 108 Ariz. 400, 403, 499 P.2d 156, 159 (1972) (same); Wiggins v. Piver, 276 N.C. 134, 141, 171 S.E.2d 393, 397-98 (1970) (same); Naccarato v. Grob, 384 Mich. 248, 253-54, 180 N.W.2d 788, 791 (1970) (same); Brune v. Belinkoff, 354 Mass. 102, 108-09, 235 N.E.2d 793, 798 (1968) (same). Even when acknowledging the issue to be one of first impression, one court applied the new rule routinely with no hint of prospective-only application. Morrison v. MacNamara, 407 A.2d 555, 562 (D.C. 1979).
The only case[12] we have found in which a court chose to make the abolition of the "locality rule" prospective only is Shier v. Freedman, 58 Wis.2d 269, 283 n. 2, 206 N.W.2d 166, 174 n. 2 (1973). See also, Cukrowski v. Mount Sinai Hospital, Inc., 67 Wis.2d 487, 501-02, 227 N.W.2d 95, 102-03 (1975). The merit in the Wisconsin approach is not apparent.
The retroactivity question with reference to the evidentiary rule  who may qualify as an expert witness  is easy. Physicians no less than others do not engage in primary private activity in reliance on rules of evidence. The refinement we place today on King v. Murphy should be applied in the trial of this case on remand. In any case in which an appeal is pending and in which the issue has been properly preserved, the evidentiary rule announced in King and refined today must be applied. In some instances, we recognize that this will necessitate a new trial. Finally, the rule applies to all cases tried after this date (including, of course, cases where the operative events giving rise to the plaintiff's claim arose prior to this date). The rule may not be applied, however, to disturb judgments which on or prior to this date have become final.
The retroactivity vel non of the rule regarding the physician's duty of care is *877 arguably more difficult. Injustice would necessarily attend our passing judgment on the conduct of a citizen by reference to substantive rules substantially different from those in effect and relied upon by the citizen at the time of his conduct. We recognize that
the confidence of people in their ability to predict the legal consequences of their actions is vitally necessary to facilitate the planning of primary activity... .

Moragne v. States Marine Lines, Inc., 398 U.S. 375, 403, 90 S.Ct. 1772, 1789, [26] L.Ed.2d 339, 358 (1970), quoted in Tideway Oil Programs, Inc., v. Serio, 431 So.2d 454, 465 (Miss. 1983).
These fundamental premises have more validity in contracts, property and other business or economic contexts than in tort cases. Still, if it could be demonstrated that at the time Dr. Hilbun prescribed the regimen of post-operative care for Mrs. Hall he acted in reliance upon the validity of standards substantially more favorable to him than those we state today, that would weigh heavily in support of non-retroactivity. We do not perceive this to be the case.
What we say today with regard to the standard of care amounts to little more than the law catching up with the way physicians have practiced their profession for years. Moreover, today's decision was "clearly foreshadowed" by the dictum in Dazet v. Bass, and by King v. Murphy. See Chevron Oil Co. v. Huson, 404 U.S. 97, 106, 92 S.Ct. 349, 30 L.Ed.2d 296, 306 (1971) (foreshadowing removes potential for injustice). We today do little more than fulfill the prophecy of Dazet and smooth some of King's rough edges. Seen in this context, retroactivity works no unfairness. Conversely, substantial unfairness to Plaintiff Hall would attend our refusal to allow a new trial to be conducted under the rules articulated above.[13]

V. Disposition Of The Case At Bar

Our task now becomes the reasoned application of these rules of law and their elaboration to the facts  and the procedural posture  of the case at bar.
Beginning with the substantive duty, we recognize that Dr. Hilbun was obligated to Terry O. Hall to exercise that degree of skill and care which a minimally competent surgeon would have exercised in the same or similar circumstances. Without question, Dr. Hilbun performed the surgery, i.e., the exploratory laporatomy, skillfully and successfully. He remained with Mrs. Hall in the recovery room from 1:35 p.m. until approximately 2:50 p.m. at which time she was alert, communicative, and her vital signs were stable. The problems arise thereafter.
In the first place, we are confident that the first 24 hours post-surgery for any patient present matters within the common knowledge of any surgeon. Subject to variation with the patient's age, history and general state of health prior to surgery, there are surely a number of commonly known and reasonably to be anticipated complications and danger signals common to all post-operative patients.[14] These are matters that surgeons such as Dr. Hilbun are expected to know. More importantly, *878 they are matters with respect to which surgeons such as Dr. Hilbun have a duty of care to their patients.
Dr. Hilbun held himself out to the public in general and to Terry O. Hall in particular as being competent to perform the surgery in question. He thereby acquired an obligation to Mrs. Hall to perform all facets of the surgery with that level of competence and diligence as might be expected of minimally competent surgeons under the circumstances. The relevant circumstances include those of the particular patient, any objectively sound local medical custom, and the facilities, resources and options available as discussed in Section III(C)(4) above. He particularly became obligated to direct the post-operative care of Mrs. Hall and to ensure that, with respect to all post-operative dangers or complications reasonably to be anticipated under the circumstances, adequate provision was made for prompt diagnosis and treatment.
A central question of law presented on this appeal is whether there was sufficient evidence presented to the court to undergird a jury finding that Dr. Hilbun had breached this duty owed to Mrs. Hall. Evidentiary sufficiency in this context, of course, is governed by our familiar standards as described in Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975), and numerous progeny, particularly including, sub silentio, Pharr v. Anderson, 436 So.2d 1357, 1361 (Miss. 1983). Considering only the proof admitted at trial, we are forced to agree that the evidence was insufficient as a matter of law and that Dr. Hilbun was entitled to a directed verdict.
As indicated above, Plaintiff Hall sought to overcome this predicament by calling as expert witnesses Drs. Hoerr and Sachs. Our outcome-determinative question, therefore, turns on whether the trial court correctly ruled, as a matter of the law of evidence, that these two witnesses could not, consistent with our law of evidence, testify as expert witnesses.
In view of what we have said in Section III(D) above, it was error to exclude the testimony of these two witnesses in its entirety. Each was clearly competent to testify regarding matters related to the level of knowledge, skill, medical judgment and general competence a surgeon should have brought to bear in prescribing and administering the post-operative regimen for a patient such as Mrs. Hall.
Dr. Hilbun makes much of the fact that his own expert witness, Dr. Donald Dohn, until recently also of Cleveland, Ohio, testified regarding the differences between practice in the Singing River Hospital and in Cleveland, Ohio. Our careful review of the testimony of Dr. Dohn fails to reveal any objectively reasonable basis for concluding that there is a difference in the regimen of post-operative care a minimally competent surgeon should have prescribed for a patient such as Mrs. Hall by reference to her genuine health care needs. The differences discussed by Dr. Dohn relate to differences in medical facilities, services and resources available to the practicing physician  no doubt those resources are greater in Cleveland, Ohio, than in Pascagoula, Mississippi. There is no basis for believing that any of these differences, however, would have resulted in any qualitative difference in the regimen of post-operative care prescribed. Put another way, a 37 year old woman such as Mrs. Hall may be expected to respond to an exploratory laporatomy the same whether she receives her surgery and post-operative care in Cleveland, Ohio, or Pascagoula, Mississippi.
Insofar as the record reflects, the only possible basis for Dr. Hilbun's contention that there are relevant differences between Cleveland, Ohio, and Pascagoula, Mississippi, regards the general quality and competence of nursing personnel. Dr. Hilbun has been less than complimentary of the nursing staff at Singing River Hospital. The record reflects that Dr. Hilbun had been practicing in the Singing River Hospital for approximately 16 years and that he was thoroughly familiar with the capabilities *879 of the nursing staff, and the limitations thereon.
By establishing the inadequacy of the nursing and personnel resources available to him in Pascagoula, Mississippi, Dr. Hilbun only increases his own responsibility.[15] Where a physician is working with medical personnel of known modest competence, his duty of instruction and control is increased. That Dr. Hilbun may have had doubts about the quality of nursing care at the Singing River Hospital lends considerable credibility to the expert testimony of Dr. Hoerr to the effect that far more specific post-operative orders or instructions should have been provided in the case of Mrs. Hall.
Without further ado, and applying to the facts of this case the legal principles stated above, we hold as follows: to the extent that the testimony of Drs. Hoerr and Sachs was excluded because these two physicians lived and had their practices in Cleveland, Ohio, the trial court erred. To the extent that the testimony of each of these physicians was excluded in its entirety because they were supposedly not familiar with the standard of care in Pascagoula, Mississippi, in general or in the Singing River Hospital in particular, the trial court erred.
Without the testimony of Drs. Hoerr and Sachs, Plaintiff Hall has no case. With that testimony, Plaintiff Hall has a fighting chance to survive a motion for a directed verdict. We say this because the trial judge, when he considered and granted defendant's motion for a directed verdict, was proceeding without reference to the testimony of Drs. Hoerr and Sachs which had been excluded. The core holding of today's decision is that the trial judge erred when he directed a verdict for defendant without taking into account the testimony of plaintiff's two out of state experts. That error was prejudicial because the testimony of Drs. Hoerr and Sachs does suggest a basis on which reasonable minds might determine that Dr. Hilbun breached the duty of care he owed to Terry O. Hall. The judgment below is reversed, and this case is remanded for a new trial.
At the new trial, if Plaintiff Hall wishes to call either Dr. Hoerr or Dr. Sachs, each may be permitted to testify and be cross-examined consistent with the legal principles stated in Sections III and IV above. More specifically and without limitation, each may describe and elaborate upon such medical knowledge as is commonly possessed or is reasonably available to minimally competent surgeons throughout the country. Each may be permitted to express an opinion as to whether the quality of post-operative care rendered Mrs. Hall by Dr. Hilbun conformed to objectively ascertained minimally acceptable levels. In expressing such an opinion, each should consider such legitimate differences of opinion as may exist within the medical profession regarding the regimen of post-operative care that ought to have been provided a patient such as Mrs. Hall. Further, to the extent that, in order to express such an opinion, consideration need be given to the facilities, equipment, personnel and general medical resources available, Drs. Hoerr and Sachs must be fully apprised of and required to assume these prior to answering.
*880 Nothing said here should be taken as an expression of opinion on our part that Dr. Hilbun has committed malpractice. All that today's decision suggests on this point is that, with the expert testimony of Drs. Hoerr and Sachs added to his case, plaintiff may be able to present a jury question; that is, plaintiff may on retrial be able to make out a case so that, when the evidence and all reasonable inferences therefrom are viewed in the light most favorable to him, the trial judge may be unable to say that no reasonable juror could find for him.
The trial judge is not by today's decision required to deny defendant's motion for a directed verdict made at the end of plaintiff's case on retrial. Rather, that motion should be considered in the light of the evidence then before the court, measured by the substantive standards articulated in Sections III(c)(3) and (4) above, and viewed favorably to plaintiff under our familiar rules. See Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975); Pharr v. Anderson, 436 So.2d 1357, 1361 (Miss. 1983). When this is done, we are confident reason and fairness will mark the outcome.
PETITION FOR REHEARING GRANTED; REVERSED AND REMANDED FOR A NEW TRIAL.
DAN M. LEE, PRATHER, SULLIVAN and ANDERSON, JJ., concur.
HAWKINS, J., specially concurs.
PATTERSON, C.J., and ROY NOBLE LEE, P.J., concur in part and dissent in part.
WALKER, P.J., dissents.
HAWKINS, Justice, specially concurring:
I concur in the decision reached by the majority.
I am grateful to Justice Robertson for his recitation of the facts, as well as the abundant authorities he has furnished on the locality rule.
Thanks should also be expressed for the graveside eulogy he has delivered to King v. Murphy, 424 So.2d 547 (Miss. 1982).
Hopefully, the Bench and Bar now has the indubitably clear expression of what I attempted to state in the King v. Murphy dissent.
PATTERSON, Chief Justice, dissenting in part; concurring in part:
I was the author of the original opinion in this cause and concluded the trial court correctly followed our rule of evidence established in Dazet v. Bass, 254 So.2d 183 (Miss. 1971). Therefore, believing the court had not committed error by following precedent, I thought an affirmance was in order. It would appear from the record, however, that the procedures followed, although correct, possibly led to an unusual result in that a full trial on the merits did not follow. It also appears, to me at least, that although authorized by our procedures the dismissal of Nurses XYZ from the suit by the plaintiff left the defendant doctor the prime target for liability and thus damages when from the record before us his negligence, if any, was slight by comparison to that of Nurses XYZ. To explain, it need be recalled that despite great fluctuation of the patients's vital signs, the doctor was simply not notified of such until called the next morning at the insistence of the patient's husband. He promptly responded but unfortunately at a time too late to save his patient.
I dissent because I think the trial judge and the attorneys were entitled to rely on our law as it existed, through precedent, at the time of the trial.
Presently in the minority, I concur with the majority that the locality rule of evidence in malpractice cases should be overturned. The rule was greatly expanded in King v. Murphy, 424 So.2d 547 (Miss. 1982). I would now forthrightly hold that we adopt the National Standard of Evidence which permits a medical expert to testify once his qualifications have been established, just as other expert witnesses are presently qualified to give testimony.
WALKER, P.J., joins the dissenting part.
*881 ROY NOBLE LEE, Presiding Justice, concurring in part and dissenting in part:

CONCURRING
I think that sufficient evidence was offered by the appellant to withstand a motion for directed verdict and, therefore, I concur with the majority in reversing the case for a full trial on its merits, though not for the reason expressed therein, and I here adopt my dissenting opinion to the original majority opinion, following:
The exploratory laparotomy, for obstruction of the small bowel, performed on 37-year-old Terry O. Hall, wife of Glenn Hall, was a serious operation, and it required the services of a trained, skillful and experienced surgeon. Post-operative care for the patient was just as important as the surgery, and required trained, skillful and experienced administering.
Dr. Hilbun performed the first phase, viz, the surgery, competently, skillfully, and successfully. He remained with Mrs. Hall in the recovery room from 1:35 p.m. until approximately 2:50 p.m., at which time she was alert, communicative, and her vital signs were stable. The doctor miserably failed the second phase. He did not see her, communicate with her, or inquire about her from 2:50 p.m. until the following morning at approximately 5:00. At that time, she was dead.
Dr. Stanley O. Hoerr and Dr. David Sachs, who were scholarly, highly-trained and eminent surgeons from Cleveland, Ohio, and whose qualifications were well recognized in their field, were called as witnesses for the appellant. Their testimony was heard outside the presence of the jury and was developed in full. At the conclusion, the lower court held that they were not qualified to testify under the locality rule. (Now similar locality rule). Parts of Dr. Hoerr's testimony which, in my opinion, is pertinent to the question here, follows:
A. My opinion is that she did not receive the type of care that she should have received from the general surgical specialist and that he was negligent in not following this patient; contacting, checking on the condition of his patient sometime in the evening of May 20th. It is important in the post-operative care of patients to remember that very serious complications can follow abdominal operations in particular in the first few hours after a surgical procedure. And this can be inward bleeding; it can be an explosive development in an infection; or it can be the development of a serious pulmonary complication, as it was in this patient. As a result of not seeing her or making an effort to find out about her condition, it is my opinion that he lost the opportunity to diagnose a condition, which in all probability could have been diagnosed at the time by an experienced general surgeon; one with expertise in thoracic surgery. And then appropriate treatment could have been undertaken to abort the complications and save her life.

There are different ways that a surgeon can keep track of his patient; follow her as the expression goes, besides a bedside visit which is the best way and which need not be very long at all in which the vital signs are checked over. The surgeon gets a general impression of what's going on. He can delegate this responsibility to a competent physician, who need not be a surgeon but could be a knowledgeable family physician or general practitioner. He could call in and ask to speak to the Registered Nurse in charge of the patient and determine through her what the vital signs are, and if she is an experienced Registered Nurse what her evaluation of the patient is. From my review of the record, none of these things took place and there is no effort as far as I can see that Dr. Hilbun made any effort to find out what was going on with this patient during that period of time. I might say or add an additional belief that I felt that the nursing responsibility which should have been exercised was not exercised, particularly at the 4:00 a.m. level when *882 the pulse rate was recorded at 140 per minute without any effort as far as I can see to have any physician see the patient or to get in touch with the operating surgeon and so on.
There is an additional thing that Dr. Hilbun could have done if he felt that the nursing services might be spotty; sometimes good, sometimes bad. This is commonly done in Columbus, Ohio, in Ashtabula, Pascagoula, etcetera. He could put limits on the degree in which the vital signs can vary, expressing the order that he should be called if they exceeded that. Examples would be: Call me if the pulse rate goes over 110; call me if the temperature exceeds 101; call me if the blood pressure drops below 100. There is a simple way of spelling out for the nursing services what the limits of discretion belong to them and the point at which the doctor should be called.
Q. Dr. Hoerr, the post-operative orders in the records that you have  I believe they are the yellow sheets toward the front. (Looking for order) Now, I have directed your attention to the post-operative orders of Dr. Hilbun, which have previously been identified by him as that. Have you had an opportunity to review the post-operative orders?
A. Yes, I have.
Q. Were there any orders in there at any place, or any other place in the records for that matter, in which Dr. Hilbun directed anyone to contact him if there were certain changes in vital signs?

A. Not that I could find. The answer is no. I couldn't see any there.

(Emphasis added)
The doctor did not place any orders on the chart for the nurses to call him in the event of a change in the vital signs of Mrs. Hall. He normally made afternoon rounds between 4 and 5 p.m., but didn't recall whether he went by to see her before going home. The doctor was on call at the hospital that weekend for anything which might come up. Subsequent to the operation and previous to Mrs. Hall's death, he was called about one other person on the same ward, one door down, twice during the night. He made no inquiry concerning Mrs. Hall, nor did he see or communicate with her.
Glenn Hall, the husband, remained in the hospital room with his wife all night. He was concerned with the breathing, restlessness, pain and color of his wife. He told the nurses what he observed several times and expressed his concern, and was assured that those symptoms were normal and routine. Finally, he realized that his wife was dying, he screamed for the nurses, and then he called Dr. Hilbun, who came immediately to the hospital, only to find Mrs. Hall had expired.
I think that the lower court was correct in holding that Dr. Hoerr and Dr. Sachs were not qualified to testify to certain facts appearing in the record because they were not familiar with the standard of care exercised at Singing River Hospital. However, other parts of their testimony which did not relate to the standard of care were admissible, including that set forth hereinabove. Such evidence goes to knowledge, training, skill and general negligence, rather than to the standard of care exercised in the locality. In Lewis v. Soriano, 374 So.2d 829 (Miss. 1979), a doctor, who had no training and skill as an orthopedic surgeon, attempted to insert a pin in a person's fractured ankle. The standard of care was not involved, but the competence or incompetence of the physician. The same principle applies where the physician or surgeon is competent but negligently fails his competence. The general rule of negligence applies.
In Pharr v. Anderson, 436 So.2d 1357 (Miss. 1983), a majority of the Court held that Dr. Pharr was liable when he went to the emergency room to check his patients, including Mrs. Anderson, found that she had been discharged by another attending physician, and did not examine her chart or attempt to obtain her return to the hospital for further treatment. The writer here dissented in that case expressing the view that Dr. Pharr was not liable, since the *883 patient had been discharged by another attending physician, whose name appeared on the hospital chart as such, and that there was no legal duty upon him to further examine the chart or to attempt her return to the hospital.
In the present case, in my opinion, the highly-trained, experienced, knowledgeable surgeon, Dr. Hilbun, was under a legal duty to closely check with and follow his patient for those complications indicated by Dr. Hoerr, and which he knew might develop. That duty is beside the standard of care, and certainly presents a question for jury determination as to whether or not there was negligence and, if so, whether such negligence was a proximate or contributing cause to Mrs. Hall's death. In my view, the following items of evidence were sufficient to withstand the motion for directed verdict:
(1) All the medical records pertaining to Mrs. Hall were introduced in evidence and were interpreted and discussed by competent physicians. That evidence and inferences were for the consideration of the jury.
(2) Testimony of Dr. Hoerr, corroborated by Dr. Sachs, mentioned and set out hereinabove, should not have been prohibited by the locality rule and the jury should have been permitted to hear and consider same.
(3) An autopsy was performed on Mrs. Hall and the report indicated, in addition to the immediate cause of death, that a sponge was left in the lower abdomen of the patient. Such constituted negligence.[1] The declaration charged, and the proof showed, that Dr. Hilbun left the sponge in the abdomen of Mrs. Hall; that she suffered pain; and recovery was asked for that pain and suffering. Such evidence with all inferences, presented a bona fide claim for the jury's consideration.
(4) Testimony of Glenn Hall, who was in the hospital room with his wife from the time she returned from the recovery room until her death, indicating what he observed, what her condition was, and how it deteriorated, with all inferences, was for the jury's consideration.
In Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975), the Court quoted and restated the principle of law applying to motions for directed verdicts, as was set out in General Tire & Rubber Co. v. Darnell, 221 So.2d 104 (Miss. 1969):
"The established rule is that when the court considers whether the defendant is entitled to a judgment as a matter of law, the court should consider the evidence in the light most favorable to plaintiff, disregard any evidence on the part of defendant in conflict with that favorable to plaintiff, and if the evidence and reasonable inferences to be drawn therefrom would support a verdict for plaintiff, the jury verdict should not be disturbed. 221 So.2d at 105."
Applying that rule to the competent evidence, both admitted and excluded in this case, in my opinion, appellant made out a prima facie case and an issue for the jury at the conclusion of his case. I think that the lower court erred in sustaining the motion for a directed verdict and I would reverse and remand for a full trial on the merits.

DISSENTING
I do not think it is necessary to enlarge upon and rework King v. Murphy, 424 So.2d 547 (Miss. 1982), and, therefore, I dissent from that part of the majority opinion.
In King, we extended and expanded the locality rule and stated the present rule for standard of care in the following language:
We are of the opinion that the locality or neighborhood rule in the State of Mississippi should not be abolished, but it should be extended and expanded. Therefore, we hold that the standard of care by which the acts or omissions of physicians, surgeons or specialists are to be judged shall be that degree of care, skill and diligence practiced by a reasonably careful, skillful, diligent and prudent practitioner in such field of practice *884 or specialty in this state, and for a reasonable distance adjacent to state boundaries. An expert witness who is knowledgeable of, and familiar with, the statewide standard of care shall not have his testimony excluded on the ground that he does not practice in this state.
424 So.2d at 550.
In my opinion, the King standard is clearly stated and is a good rule which protects all party litigants in introducing medical testimony. Any astute and skillful attorney can qualify a physician who is truly an expert in his field.[2]
King has been reported slightly over two years. Cases coming before us now, tried under King, indicate that attorneys had no difficulty in qualifying medical experts who are, in fact, experts. Although I do not disagree with a great deal of the majority opinion in discussing King, I think that the King decision is good for Mississippi and should not be tampered with.
DAN M. LEE, J., joins the concurring portion of this opinion.
WALKER, P.J., joins the dissenting portion.
NOTES
[1] The Singing River Hospital and its administrator were dismissed on sovereign and public official immunity grounds, and no error relating thereto is assigned on appeal. The nurses were not named originally, and plaintiff never amended to name them or have them served with process.
[2] By agreement of the parties, Dr. Dohn testified "out of turn". The record reflects that other professional obligations of Dr. Dohn would have rendered his appearance any other time extremely inconvenient. The trial judge and the parties appropriately respected Dr. Dohn's convenience. In any event, this is why we have before us the testimony of a defense expert, even though the trial ended with the direction of a verdict at the end of plaintiff's case.
[3] For convenience here, we use the term physician to include all persons possessing an M.D. and providing medical or surgical services.
[4] A most immediate example of this mis-reading of King is that of Appellee Hilbun. In his brief filed February 9, 1984, at page 17, counsel for Dr. Hilbun reads King as allowing the expert testimony only by "a physician who practices within a reasonable distance adjacent to state boundaries, [and] who is... ."
[5] As a practical matter there is often little difference between this "similar community" standard and the "national" standard. See Goffe v. Pharmaseal Laboratory, Inc., 90 N.M. 764, 767, 568 P.2d 600, 604 (1976) (Washington doctor, who testified that medicine was practiced in Washington in a manner similar to Albuquerque, New Mexico, could describe the standard of care applicable to Albuquerque).
[6] States such as Arizona and Kansas, for examples, employ this "similar community" standard only to general practitioners, and hold specialists to a "national" standard; Kronke v. Danielson, 108 Ariz. 400, 403, 499 P.2d 156, 159 (1972) ("similar community" for general practitioners and "national" for specialists); compare Chandler v. Neosho Memorial Hospital, 223 Kan. 1, 3-4, 574 P.2d 136, 138 (1977) ("similar community" standard for general practitioners) with Simpson v. Davis, 219 Kan. 584, 587-88, 549 P.2d 950, 953-54 (1976) ("national" standard for specialists).
[7] To the extent they may announce or proceed on the assumption of the existence of rules of law in conflict with those set forth here, King v. Murphy, Holmes v. Elliott, 443 So.2d 825 (Miss. 1983), and all of our other prior medical malpractice cases shall from and after this day stand modified or overruled as may be appropriate.
[8] What we say here is consistent with Rule 702 of the proposed Mississippi Rules of Evidence, petitions for adoption of which are presently pending before the Court. See also, House v. State, 445 So.2d 815, 822 (Miss. 1984).
[9] Anything to the contrary which may be found in King v. Murphy, Holmes v. Elliott, or any of our other prior medical malpractice cases shall stand authoritatively modified by what we say here. See supra Note 7.
[10] The duty "was" what it "reasonably should have been"  see the point regarding the non-controlling effect of local medical custom or practice stated above in subsection III(c)(3) on pages 875 and 876.
[11] Counsel noticeably eschews application of these epithets to the two proffered experts in the case at bar, Drs. Hoerr and Sachs.
[12] Alaska also has not applied a new standard of care retroactively, but that is because the standard was legislatively enacted by statute which expressly announced the date said statute was to be effective. Priest v. Lindig, 583 P.2d 173, 177 n. 13 (Alaska 1978).
[13] King v. Murphy was decided November 17, 1982. Petition for rehearing was denied January 14, 1983. 424 So.2d 547. Pharr v. Anderson, 436 So.2d 1357 (Miss. 1983), arose out of events occurring on January 23-24, 1979. Language in the opinion suggests that the King rule was "consulted" to determine the competence of the testimony of a medical expert. 436 So.2d at 1359. Holmes v. Elliott, 443 So.2d 825 (Miss. 1983), arose out of events occurring in September of 1977. King v. Murphy was applied to exclude the testimony of an expert medical witness from Oklahoma City, Oklahoma. It is true that Reikes v. Martin, No. 53,915, decided on January 25, 1984, states that King v. Murphy shall be applied prospectively only. Reikes is pending before this Court on petition for rehearing. Consistent with the implications of Pharr, the holding of Holmes, and what we have said above, the statement in Reikes is seen as incorrect.
[14] On retrial it should be developed more fully whether and to what extent a 140 pulse rate and adult respiratory distress syndrome are "commonly known and reasonably to be anticipated complications".
[15] The limited record before us suggests that the nurses charged with attending Mrs. Hall on the early morning hours of May 21, 1978, were grossly negligent. They were sued originally as "X, Y, and Z, Unknown Nurses". Although the names of these nurses were produced in answers to interrogatories, plaintiff inexplicably never amended to name them formally or have them served with process.

Again, on this limited record, it appears that Dr. Hilbun's failures in the area of post-operative care were not so substantial as the nurses' failures. Under established law, however, if Dr. Hilbun breached the duty of care he owed to Mrs. Hall and if such breach, if any, was a proximate cause of Mrs. Hall's death, plaintiff may recover full damages of and from Dr. Hilbun, notwithstanding that others may have been more at fault and that their fault was the more substantial factor causing Mrs. Hall's death. This case falls within the settled rule that joint tortfeasors are jointly and severally liable to the plaintiff who, at his election, may sue fewer than all and recover full damages from those sued. See Campbell v. Schmidt, 195 So.2d 87, 89-90 (Miss. 1967); Bailey v. Delta Electric Light, Power and Manufacturing Co., 86 Miss. 634, 636, 38 So. 354 (1905).
[1] No one contends that the sponge caused or contributed to the death.
[2] See pages 874-875 of the majority opinion.