515 So.2d 882 (1987)
Edward LADNER, Individually and as Administrator of the Estate of Judith Ladner
v.
H.F. CAMPBELL, M.D.
Nos. 57084, 57086.
Supreme Court of Mississippi.
November 4, 1987.
*883 Robert W. Smith, Biloxi, for appellant.
Thomas L. Stennis, II, J. Robert Ramsay, L. Christopher Breard, Bryant, Stennis & Colingo, Gulfport, Jack Parsons, Parsons & Matthews, Wiggins, for appellee.
Before ROY NOBLE LEE, C.J., and PRATHER and SULLIVAN, JJ.
PRATHER, Justice, for the Court:
A medical malpractice case alleging a failure to timely diagnose and treat cancer gave rise to this appeal. Judith Ladner and her husband, Edward, filed a complaint against Dr. H.F. Campbell, for this alleged negligent diagnosis, which suit, filed in the Circuit Court of Stone County, concluded in the granting of a directed verdict at the conclusion of plaintiff's case in favor of Dr. Campbell. Ladner appeals from the directed verdict and judgment and from a subsequent order overruling a motion for relief from final judgment, assigning as error inter alia the following:
(1) The circuit court erred in excluding the entire testimony of Dr. Dwight Brower as an expert witness for appellant.
(2) The circuit court erred in granting a directed verdict and judgment in favor of appellee Campbell.

I.
On September 15, 1982, Edward and Judith Ladner filed a complaint against H.F. Campbell, M.D., a physician in the general practice of medicine in Wiggins, Mississippi, stating that he failed to properly diagnose Judith Ladner's breast cancer in its *884 early stages when symptoms indicated a cancerous condition. Dr. Campbell's answer is essentially a general denial.
Because Judith Ladner died during pendency of the action, on motion to revive, the court ordered that the action be revived, that Edward Ladner be authorized to proceed individually and on behalf of all heirs of Judith Ladner and as administrator of her estate, and that he be authorized to amend the complaint to reflect the death of Judith Ladner on December 28, 1983 and to allege that Campbell is further liable for wrongful death.
Judith Ladner's deposition was introduced at trial. In that deposition she stated that she had performed self-examinations of her breast for many years because her family's medical history included the removal of two tumors from her aunt. She went to see Dr. Campbell, licensed in family practice, on June 10, 1981, because the night before she had felt a lump at the upper part of her breast on the left side. This visit was about a week and a half before her next menstrual period.
She told Dr. Campbell "I think I found a lump in my breast." He said, "Oh, let's not jump to conclusions," and examined her and then asked her to locate the lump. She denied showing Dr. Campbell the general area of the lump and stated, "I showed him the lump... ." Campbell said that he felt nothing and that it seemed that her breast bone was bigger on the left than on the right side. When he started to walk away, she said, "But, Dr. Campbell, it's sore." Campbell said he imagined she was sore because she had been mashing it all night, but reassured her that there was no reason for alarm and suggested that she return to work. They shared some remarks with levity about her undue concern. Leaving the doctor's office, she told the receptionist that she felt like an idiot and that there was nothing in the world wrong with her.
Although she continued self-examination and found the same lump about three times between June and October, she forgot about it, as her life was very busy. She stated that she did not seek a second opinion because she did not want to be laughed at again, although she too had laughed.
At a football game on October 16, 1981, she threw up her arms to cheer and had to leave because of pain. She testified that on Saturday, October 17, she saw Dr. Campbell, who asked why she had not been in to see him sooner. She began crying and told him she had, and when he looked at the chart he said, "Oh, my God, you did." Dr. Campbell said that a biopsy had to be done immediately. After the biopsy, the doctor said, "I have made a great mistake on you," and "I feel terrible about what's happened."
Dr. Campbell, called as an adverse witness, testified that Judith Ladner complained of a lump in her high chest on the chest wall between the third and fourth rib. He further stated that the lump was not big enough for him to feel, to palpate, to diagnose or for her to show him in the office and that neither the woman nor the doctor can find a lesion smaller than one centimeter. He could not find the lump, and she could not show him or demonstrate a lump. He examined her for ten minutes. He testified that she finally admitted, "Doctor, I cannot find a lump in my breast at this time," that he told her to examine herself daily, to call anytime she found something suspicious and to return regardless in three months, and that she said she would.
Dr. Campbell stated that it is fair to say that the cancer grew between June and October, 1981, but even if the cancer were diagnosed, in all probability it would have been too late.
The testimony of Judith Ladner's husband, Edward Ladner, generally corroborated Judith Ladner's deposition, and he stated that he felt the lump in June, 1981.
Dr. David M. Owen, specializing in oncology, the study and treatment of cancer, and practicing in Mississippi, testified that he was Mrs. Ladner's primary physician from October, 1981 to her death. He stated that he knows of no way to diagnose a lump in the breast if he can't palpate it. A mammogram may have helped if the lump were far down in the chest, but it would *885 have shown nothing in this case. His hands would be more accurate, and statistically a trained physician's examination is better than a mammography in detecting cancer. The mammography of October 22, 1981 and two subsequent ones failed to reveal the existence of cancer, but falsely showed fibrocystic disease.
Dr. Owen next testified as to "staging." Staging in reference to breast cancer is a means of deciding the extent of the involvement of the cancer. In Dr. Owen's opinion, Mrs. Ladner was in stage II in October, 1981, with a five year survival rate of 35 percent, as opposed to 70 percent for stage I patients. Where four or more axillary nodes are involved as shown by the surgery here, the survival rate falls considerably. Within a reasonable medical probability, there were undoubtedly four nodes involved in June, and the disease had spread beyond the nodes. It does not necessarily spread from node to node. If there were fewer than four involved in June, her chances of survival would have been better. Other factors gave her a very poor prognosis. Within a reasonable medical probability, the four month delay did not effect her chance of survival. Had the cancer been found June 10, 1981, there would be no change in the likelihood of her living beyond December 28, 1983, regardless of what Dr. Campbell could have done.
In the opinion of Dr. Owen, based on reasonable medical probability, Dr. Campbell did not deviate from the medical diagnostic standards. Owen's testimony was that Ladner's complaint of soreness and pain had no relation to the subsequent diagnosis on October 17; that nothing Dr. Campbell did or failed to do contributed in any way to the cancer or the extent of it or aggravated it; and that all the same expenses would have been incurred if a lump had been found in June, 1981.
Dr. Altemose, another oncologist, testified next by deposition. His opinion as to breach of the standard of care was excluded. He did testify that within a reasonable medical probability, assuming Dr. Campbell's records are correct, she would have been clinically a stage I in June, 1981 with an 85 percent five year survival chance, and stage II in October, 1981 with a 66 percent five year survival chance. Dr. Altemose stated that within a reasonable medical probability, in view of the pathological staging, nothing from June 10, 1981 to December 28, 1983 could have been done that would have altered her survival one day, although her primary caring oncologist and perhaps her surgeon would be best able to predict her ultimate outcome.
The plaintiff offered the testimony of a general practitioner, Dr. Dwight Brower of Baton Rouge, Louisiana. His testimony as to the standard of care was excluded by the trial court as incompetent. This is the subject of the first assignment of error and will be discussed in more detail in Part II of this opinion. With the exclusion of Dr. Brower's testimony, the complainant rested.
After the plaintiff rested, the court directed a verdict for the defendant, Dr. Campbell, because the defective nature of Dr. Altemose's hypothetical and the cross-examination of Dr. Altemose took away any basis upon which a verdict for the plaintiff could stand.

II.

DID THE CIRCUIT COURT ERR IN EXCLUDING THE TESTIMONY OF DR. BROWER, ONE OF APPELLANT'S THREE EXPERT WITNESSES?
Dr. Brower is certified in family practice in Baton Rouge, Louisiana. Although he testified that he was familiar with the standard of care in Mississippi as applied to the examination, diagnosis and treatment of breast cancer, the court excluded his testimony because he did not have knowledge of and was not familiar with the statewide standard of care. Plaintiff's counsel then sought to have Dr. Brower testify to things "other than standard of care," that is, matters which are important in family practice and the cause of death. The court ruled that without the sufficient knowledge or familiarity with the statewide standard, he could not testify at all.

*886 A.
As this case was tried June, 1984, Dr. Dwight Brower's qualifications establishing his competency to testify were controlled by the then statewide standard of care of King v. Murphy, 424 So.2d 547 (Miss. 1983). The facts to which Brower testified evidencing his knowledge and familiarity with the statewide standard of care were the following:
(1) Proximity of his home town of Baton Rouge to Mississippi;
(2) Overlapping of medical faculties between Louisiana State University and University of Mississippi, (several of his professors being from the University of Mississippi, specifically a surgery professor, in whose class treatment of breast cancer was taught);
(3) Use of medical textbooks in general use throughout the country and specifically the south, which generally agreed as to proper handling of a woman presented with breast complaints and how to deal with them;
(4) Membership in American Academy of Family Physicians, required continuing medical education, which has dealt with the issue of breast cancer and proper evaluation thereof, evidencing no deviation in the standard of care throughout the nation and the State of Mississippi;
(5) Teaching medical students and residents in the identical standard of care notwithstanding their ultimate residence or practice location (at least one resident located his practice in the Mississippi area of Gulfport and Biloxi);
(6) Practicing with a physician who was trained and did his residency at the University of Mississippi, imparting some degree of his knowledge as to the standard of care in Mississippi regarding breast cancer and detection;
(7) Consultation with Altemose as to his opinion of the standard of care in Mississippi, specifically, as to the presence of safe and effective mammography to patients in this area of Mississippi;
(8) Reading of Dr. Campbell's deposition, noting that Campbell had his patients obtain mammography upon referral to Hattiesburg and that Campbell has had the same continuing medical education as a member of the American Academy of Family Physicians, has read the same journals, and did the rotating internship at the same charity hospital facility in Louisiana that Brower did;
(9) Research of literature regarding appropriate evaluation of patients with breast symptoms, finding no indication of any different statistics or otherwise on any regional basis that would demand a different standard of care in Mississippi or any other area, the literature revealing only a national standard of care and no difference between states in such close proximity as Louisiana and Mississippi;
(10) Reading deposition of Dr. Altemose and discussing care and treatment of Judith Ladner and the standard of care with Altemose, and
(11) Further discussions at annual Louisiana Family Physicians meetings in New Orleans most years since being in practice, attended by a high percentage of Mississippi physicians particularly from the Gulf Coast, covering broad topics, but including a formal discussion and lectures on the breast and breast diseases.
These facts support Dr. Brower's competency to testify as to the statewide standard of care. The trial judge was in error in excluding Dr. Brower's testimony based on lack of knowledge of and familiarity with the statewide standard of care. King v. Murphy, supra. Additionally, the national standard of care, set forth by the subsequent case of Hall v. Hilbun, 466 So.2d 856 (Miss. 1985), was applied retroactively. Id. at 875-877. In fact, Dr. Brower's testimony was competent under both the statewide and national standards based upon his knowledge, skill, experience, training, and education.

B.
Thus, Campbell is left only with his argument that Brower's testimony would not assist the trier of fact, as required in Hall, *887 Id. at 873-874[1], and that thus exclusion of that testimony is only harmless error.
In considering whether the exclusion of this testimony is harmless error, this Court must determine whether the testimony is sufficient, particularly as to the issues of breach of the standard of care and proximate cause, to preclude a directed verdict, as Campbell argues that he neither breached the applicable standard of care nor caused the death of Judith Ladner.
A proffer of Dr. Brower's testimony was made. He stated that in his opinion, Dr. Campbell did not live up to the standard of care in diagnostic techniques in this case in the following respects: that Campbell failed to ask the right questions regarding her menstrual history and cycle; that he put too much emphasis on his physical examination, rather than her notation of change based upon her routine self-examination; that, her determination of a change was a significant fact requiring appropriate followup and/or testing; that he failed in the counseling aspect, keeping her from returning again because she would be laughed at; that he did not have a high enough index of suspicion; and that he did not ask her to return two days to a week after her next menstrual period; and that he should have x-rayed by ordering a mammography.
Brower further proffered that Campbell failed to diagnose a diagnosable lesion in her breast in June, 1981; that within a reasonable medical probability, a mammography on that day would have detected the lesion; and that the failure to diagnose probably caused her long time survival to be significantly decreased. Brower also testified that prognostication about a cancer patient's chances is difficult for any physician, especially as to breast cancer. On June 10, a poor prognosis was signaled by (1) her status as an estrogen receptor negative (making hormonal therapy unlikely to succeed) and possibly (2) her age. Nevertheless, a good prognosis was indicated by (1) the malignancy of the tumor being in the most common classification (moderate metastasis), (2) the small size of the tumor, giving her an even chance of not having metastasized to the armpits, and (3) the fact that she probably had fewer than four axilla lymph nodes involved (based on the involvement of four nodes at the time of the mastectomy), giving her a five year survival chance of 62 percent on June 10, as opposed to 32 percent at the time of her surgery. Brower stated that the delay in chemotherapy was extremely important. In Dr. Brower's opinion, there was significant difference in her having been treated in the Fall versus four months earlier, and the difference was a substantial contributing cause of death.

C.
At the conclusion of plaintiff's proof in a medical malpractice case, upon motion by the defendant for a directed verdict, the trial court is required to consider the evidence in a light most favorable to the plaintiff, considering the testimony in behalf of the plaintiff to be true along with all reasonable favorable inferences that may be drawn therefrom, and evidence of contradiction thereof must not be considered. Boyd v. Lynch, 493 So.2d 1315, 1317 (Miss. 1986); Clayton v. Thompson, 475 So.2d 439, 443 (Miss. 1985); Hammond v. Grissom 470 So.2d 1049, 1053 (Miss. 1985).
To present a prima facie case of medical malpractice, a plaintiff, (1) after establishing the doctor-patient relationship and its attendant duty, is generally required to present expert testimony (2) identifying and articulating the requisite standard of care and (3) establishing that the defendant physician failed to conform to the standard of care. Boyd v. Lynch, 493 So.2d 1315, 1318 (Miss. 1986); Hammond v. Grissom, 470 So.2d 1049, 1053 (Miss. 1985). In addition, (4) the plaintiff must prove the physician's non-compliance with the standard of care caused the plaintiff's injury, as well as proving (5) the extent of the plaintiff's *888 damages. Boyd v. Lynch, 493 So.2d at 1318.
Thompson v. Carter, 518 So.2d 609 (Miss. 1987).
The physician's duty of care is that, given the circumstances of each patient, each physician has a duty to use his or her knowledge and treat through maximum reasonable medical recovery, each patient, with such reasonable diligence, skill, competence and prudence as are practiced by minimally competent physicians in the same specialty or general field of practice throughout the United States, who have available to them the same general facilities, services, equipment and options. Hall v. Hilbun, 466 So.2d 856, 873 (Miss. 1985) (and its progeny).
Because, like Campbell, Brower is a family physician, he is surely no less qualified to testify as to the standard of care and breach thereof than are the oncologists, who, while having been qualified to testify as to breast examinations, practice in an entirely different specialty. It is this Court's opinion that Dr. Brower's proffered testimony, coupled with the testimony of Judith Ladner, would have been sufficient to support a finding of the requisite standard of care and an alleged breach thereof sufficient to withstand a motion for directed verdict.
It is noted in this record that Dr. Owens, one of the two oncologists who testified for the plaintiff as to the standard of care in diagnostic procedures, was more supportive of the defendant doctor's position than that of the plaintiff. Nonetheless, a party litigant in a wrongful death action is not bound by conflicting testimony of his own medical witnesses. 31 Am.Jur.2d Expert & Opinion Evidence, § 189 (1967).
Our consideration must go further and address the issue of proximate cause. The recent decisions on this point in the various courts have pinpointed a problem area as to proof of the causal connection in cancer cases between the alleged negligence and the injury complained of. That problem is noted as follows:
... Proof of causation is particularly difficult in cases where the results complained of are such as might normally be expected to follow from the original disease or injured condition, as is the case when a plaintiff complains of the defendant doctor's failure to cure, rather than of any positive effects of mistreatment. Plaintiffs in such cases are faced with the difficulty of obtaining and presenting expert testimony that if proper treatment had been given, better results would have followed. When the available testimony indicates that it is less than certain that proper conduct on the part of a medical practitioner would have produced results different from those complained of, the courts have been faced with the question whether the evidence is sufficient to establish the causation component essential to the plaintiff's right of action.
In cases of this nature, the courts have uniformly adopted the position that proof of causation does not require that it be shown that the patient was certain to have recovered or improved with sound medical care, and it has often been said that the plaintiff may sustain the burden of establishing proximate causation with evidence that it was probable, or more likely than not, that the patient would have been helped by proper treatment (§ 3). Sometimes observing that medicine is not an exact science which would permit certain proof of causation, the courts have accordingly permitted the finding that medical malpractice was a proximate cause of results which proper treatment probably would have prevented, even though the effects on the patient were attributable to the patient's disease or injury.
54 A.L.R. 4th 10, § 2[a] (1987).
This Court has concluded "that Mississippi law does not permit recovery of damages because of mere diminishment of the `chance of recovery'. Recovery is allowed only when the failure of the physician to render the required level of care results in the loss of a reasonable probability of substantial improvement of the plaintiff's condition." *889 Clayton v. Thompson, 475 So.2d 439, 445 (Miss. 1985).
Many other courts have adopted the same rule, often enunciated as follows: "[A]dequate proof of proximate cause in a medical malpractice action of this type requires evidence that in the absence of the alleged malpractice, a better result was probable, or more likely than not." 54 A.L.R. 4th 10 § 4. Some courts have held that the plaintiff has to supply evidence that proper treatment would have provided the patient "with a greater than fifty (50) percent chance of a better result than was in fact obtained." 54 A.L.R.4th 10 § 2[a]. The Clayton decision clearly placed the Mississippi rule in alignment with these jurisdictions, and rejected the notion that a mere "better result absent malpractice" would meet the requirements of causal connection.
Both Dr. Owen and Dr. Altemose testified that within a reasonable medical probability, based on pathological staging, the decedent's survival time could not have been changed had the cancer been discovered on June 10, 1981. Dr. Altemose further testified that her primary caring oncologist, Dr. Owen, could best predict her ultimate outcome. He also testified that her five year survival chance, under clinical staging, could have been increased from 66 percent to 85 percent.
Dr. Altemose himself pointed out, in effect, that pathological staging takes into consideration a wider range of factors or examination results than does clinical staging. His testimony as to clinical staging included only the results of Dr. Campbell's original examination, but his testimony as to pathological staging takes into consideration information from the pathologist as to involvement of the nodes and the size of the tumor. "When an expert's opinion is based upon an inadequate or incomplete examination, that opinion does not carry as much weight and has little or no probative value when compared to the opinion of an expert that has made a thorough and adequate examination." Johnson v. Ferguson, 435 So.2d 1191, 1195 (Miss. 1983). In Johnson, the doctor's subjective examinations and x-rays were little more than estimates in light of the fact that the ultimate diagnostic tool for discovering an unusual presentation of a ruptured disc was a myelogram. In the same way, Dr. Altemose has admitted, in effect, that the more definitive method of staging is pathological staging. If the factors considered to determine clinical staging may be considered A plus B, then those used to determine pathological staging may be considered A, plus B, plus C, plus D.
However, assuming that the lower court was correct that the testimony considered by the court did not establish proximate cause, the court was in error in directing a verdict for the defendant because the improperly excluded testimony of Dr. Brower would have been sufficient for a jury to find the existence of proximate cause. Dr. Brower pointed out the difficulty of prognostication for any physician. Furthermore, Dr. Brower did use the pathology reports in staging the disease, taking into consideration his estimate of the number of lymph nodes involved in June, 1981 (which the oncologists could only estimate) and the size of the tumor. The fact that an expert is not a specialist in the particular area of medicine involved in the case affects the weight of his testimony, but does not destroy its probative force. 32 C.J.S. Evidence § 569(3) (1964).
It is this Court's opinion that the exclusion of Brower's testimony was error, and was not harmless, and it would have precluded a directed verdict. While expressing no opinion as to the weight of the evidence, this Court would again point out that a motion for directed verdict should be overruled even though a verdict in favor of the plaintiff would be contrary to the overwhelming weight of the evidence. Evans v. Journeay, 488 So.2d 797, 799 (Miss. 1986).
Finally, this Court's recent admonition to trial judges, faced with a request for a peremptory instruction in the case of a claim on an insurance policy, should be repeated here and applied to medical malpractice cases.

*890 This Court has repeatedly urged trial judges, faced with a motion for a directed verdict or a peremptory instruction, in doubtful cases, to go ahead and submit all issues to the jury, reserving the prerogative of "correcting" any jury verdict later on a motion for judgment notwithstanding the verdict. See, e.g., Astleford v. Milner Enterprises, Inc., 233 So.2d 524, 526 (Miss. 1970); Claiborne v. Greer, 354 So.2d 1109, 1111 (Miss. 1978). This, we say, saves needless retrials if on appeal we disagree with the trial judge and hold that a jury issue was made out.
Reserve Life Insurance Co. v. Magee, 444 So.2d 803, 818 (Miss. 1983).
This Court holds that due to the improper exclusion of Dr. Brower's testimony, this case must be reversed and remanded for a new trial. Therefore, this Court does not address the remaining assignments of error not pertinent on retrial.
REVERSED AND REMANDED FOR NEW TRIAL.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.
NOTES
[1] This requirement is set forth in Mississippi Rule of Evidence 702 effective as to trials after January 1, 1986.