2000 SD 87

**David JORGENSON and Laura Jorgenson, Plaintiffs and Appellants,**

v.

**Michael J. VENER, M.D., Defendant and Appellee,**

No. 21139.

Supreme Court of South Dakota.

Argued March 22, 2000.

Decided July 5, 2000.

Daniel R. Fritz Fritz Law Offices, Aberdeen, South Dakota and James R. Welsh of Bradford, Coenen & Welsh, Omaha, Nebraska, Attorneys for plaintiffs and appellants.

Reed Rasmussen of Siegel, Barnett & Schutz, Aberdeen, South Dakota, Attorneys for defendant and appellee.

MILLER, Chief Justice

[¶ 1.] In this medical malpractice case we reverse the trial court and hold that the "loss of chance" doctrine is recognized at common law in this state.

### FACTS

[¶ 2.] On August 16, 1997, while visiting at a relative's home in Wisconsin, David Jorgenson jumped from a deck on the house to a cement sidewalk below, a distance of approximately seven feet. The impact shattered his lower right leg and ankle. He was taken to a nearby hospital, where a doctor inserted pins into the leg and ankle and stabilized the injury with a device called an external fixator. Jorgenson was discharged from the Wisconsin hospital five days later.

[¶ 3.] Upon returning to his home in Waubay, South Dakota, Jorgenson continued treatment of his injury with Dr. Mi-

chael Vener of Watertown, a physician specializing in orthopedic surgery. Dr. Vener, after noticing some drainage around the pins in Jorgenson's leg, placed him on a weeklong course of antibiotics. Approximately one month after the accident, Dr. Vener re-aligned the external fixator. At that time, an open sore of approximately 1 1/2" was noted on the lower shin of Jorgenson's right leg.

[¶ 4.] In late October, Jorgenson began feeling feverish. He also noticed drainage and a foul-smelling odor coming from the blister on his leg. Dr. Vener prescribed another course of antibiotics for him.

[¶ 5.] On November 10, 1997, Dr. Vener removed the external fixator. Approximately two weeks later, Jorgenson again noticed drainage and a foul-smelling odor coming from the open sore. However, this time he could also see a bone at the surface of the wound. Jorgenson immediately contacted Dr. Vener, who prescribed another course of oral and topical antibiotics. In addition, an appointment with a doctor in Fargo was scheduled to assess whether a "free flap" procedure should be done, in the words of Dr. Vener, "in order to salvage the limb."

[¶ 6.] Jorgenson never went to the doctor in Fargo. Instead, he made an appointment at the Mayo Clinic in Rochester, Minnesota, on December 4th. There Jorgenson was told he had two options concerning treatment of the leg: attempt a bone and skin graft, which would encompass two years of treatment with a 60% chance of success, or immediate amputation. Jorgenson chose the latter. On December 9, 1997, he underwent a below-the-knee amputation of his right leg.

[¶ 7.] Jorgenson and his wife subsequently filed this medical malpractice action, claiming Dr. Vener failed to diagnose a chronic infection in the bone and also failed to refer him to an infectious disease specialist. According to Jorgenson, Dr. Vener's negligence caused a "loss of the chance" for him to save his leg.

[¶ 8.] After discovery had ensued, Dr. Vener filed a motion for summary judgment. The trial court granted the motion. Jorgenson appeals.

## STANDARD OF REVIEW

[¶ 9.] Our review of a trial court's granting of summary judgment is well settled.

"In reviewing a grant or a denial of summary judgment under SDCL 15-6-56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper."

*Millard v. City of Sioux Falls*, 1999 SD 18, ¶ 8, 589 N.W.2d 217, 218 (quoting *Walther v. KPKA Meadowlands Ltd. Partnership*, 1998 SD 78, ¶ 14, 581 N.W.2d 527, 531 (citations omitted)).

## DECISION

[¶ 10.] **The loss of chance doctrine is recognized in South Dakota.**

[¶ 11.] After reviewing briefs and conducting a hearing, the trial court granted Vener's motion for summary judgment, concluding that "the loss of chance doctrine is not compatible with South Dakota law." Jorgenson asserts this decision was incorrect, contending South Dakota recognizes the loss of chance doctrine and that it encompasses the type of harm inflicted by Vener's negligence. In contrast, Vener argues that the doctrine is not recognized in South Dakota, and that we should not low-

er our traditional causation standard by adopting it. Vener alternately asserts that even if the loss of chance doctrine is adopted in this state, Jorgenson did not present sufficient evidence to establish causation under the lower standard. We have not had the opportunity to determine whether the loss of chance doctrine is recognized at common law in this state.[1]

[¶ 12.] The loss of chance doctrine involves the idea that a doctor, by doing something wrong, has decreased the patient's chance of recovery or survival. Margaret T. Mangan, Comment, *The Loss of Chance Doctrine: A Small Price to Pay for Human Life*, 42 S.D.L.Rev. 279, 283 (1997).[2] Various arguments opposing and supporting the doctrine have been proffered by courts and commentators. *See* Keith, *supra*, at 770–80; Mangan, *supra*, at 292–98 (and sources cited therein). Opponents[3] generally contend that it alters or eliminates the requirement of proximate causation. *Gooding v. University Hosp. Building, Inc.*, 445 So.2d 1015, 1019 (Fla. 1984); *Falcon v. Memorial Hosp.*, 436 Mich. 443, 462 N.W.2d 44, 65 (1990) (Riley, C.J., dissenting).[4] They also assert that loss of chance relies on speculative statistical evidence in order to show how much chance was lost by the physician's actions. *Fennell v. Southern Maryland Hosp. Ctr., Inc.*, 320 Md. 776, 580 A.2d 206, 213–14 (1990). Further, they argue that it places

---

**1.** The parties cite *Limpert v. Bail*, 447 N.W.2d 48 (S.D.1989), *Steckman v. Silver Moon, Inc.*, 77 S.D. 206, 90 N.W.2d 170 (1958), *Lohr v. Watson*, 68 S.D. 298, 2 N.W.2d 6 (1942), *Voegeli v. Lewis*, 568 F.2d 89 (8th Cir.1977), and other cases in support of their respective positions. However, none of these cases expressly endorse or renounce the loss of chance doctrine in a medical malpractice context.

**2.** Vener correctly points out that the loss of chance doctrine has its roots in at least three sources. One source is Joseph H. King, Jr., *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences*, 90 Yale L.J. 1353 (1981). The doctrine has also been attributed to § 323(a) of the Restatement (Second) of Torts, which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
> (a) his failure to exercise such care increases the risk of such harm[.]

Restatement (Second) of Torts § 323(a) (1965). A third source is a 1966 opinion from the Fourth Circuit Court of Appeals, *Hicks v. United States*, 368 F.2d 626, 632 (4th Cir. 1966), wherein the court stated:

> When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of sur-

vival and the defendant has destroyed it, he is answerable.

For a current, comprehensive review of the loss of chance doctrine, *see generally*, Mangan, *supra*, and Darrell L. Keith, *Loss of Chance: A Modern Proportional Approach to Damages in Texas*, 44 Baylor L.Rev. 759 (1992).

**3.** Mangan and Keith identified approximately fifteen states that have rejected the loss of chance doctrine. Mangan, *supra*, at 294 n. 143; Keith, *supra*, at 777 n. 112. Notable among those jurisdictions rejecting the doctrine is Minnesota, in *Cornfeldt v. Tongen*, 295 N.W.2d 638 (Minn. 1980), and *Fabio v. Bellomo*, 504 N.W.2d 758 (Minn.1993).

**4.** The Michigan legislature overruled the majority's acceptance of the loss of chance doctrine in *Falcon* by enacting the following statutory amendment:

> In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.

Mich. Comp. Laws § 600.2912a(2)(2000) (amended by 1993 Mich. Pub. Acts No. 78). Four years later, the Michigan Supreme Court further rejected the loss of chance doctrine by failing to recognize it in a case involving physical harm less than death. *Weymers v. Khera*, 454 Mich. 639, 563 N.W.2d 647 (1997).

medical malpractice liability on a separate standard compared to other professions. *Gooding,* 445 So.2d at 1019–1020. Finally, they contend that relaxation of the traditional causation standards will ultimately produce greater injustice in the form of increased medical malpractice litigation and higher malpractice insurance premiums, which will be passed on to patients. *Fennell,* 580 A.2d at 214–15; *see also, Cooper v. Sisters of Charity of Cincinnati, Inc.,* 27 Ohio St.2d 242, 272 N.E.2d 97, 103 (1971) (stating that such a rule would "produce more injustice than justice").[5]

[¶ 13.] Proponents of the doctrine [6] assert that it permits at least some form of recovery for the victim, rather than the all-or-nothing approach under the traditional standard of proof of causation. *Kramer v. Lewisville Mem'l Hosp.,* 858 S.W.2d 397, 408 (Tex.1993) (Hightower, J., dissenting); *Herskovits v. Group Health Coop. of Puget Sound,* 99 Wash.2d 609, 664 P.2d 474, 486 (1983) (Pearson, J., concurring); *see also* Mangan, *supra,* at 292. A related argument is that it allows for allocation of losses attributable to a physician's negligence. *Kramer,* 858 S.W.2d at 409 (Hightower, J., dissenting); *Herskovits,* 664 P.2d at 486–87 (Pearson, J., concurring); *see also* Mangan, *supra,* at 292–293; King, *supra,* at 1377. Proponents also contend that the costs of uncertainty (whether a patient would have recovered but for the physician's negligence) should be imposed on the doctor rather than the patient. *Kramer,* 858 S.W.2d at 409 (Hightower, J., dissenting); *Herskovits,* 664 P.2d at 487 (Pearson, J., concurring); *see also* Mangan, *supra,* at 293; King, *supra,* at 1378. Finally, they argue that any chance of recovery, no matter how small, is a legally cognizable interest (a patient's health is valuable, even though the chance of recov-

ery may be less than 50%). *Kramer,* 858 S.W.2d at 409 (Hightower, J., dissenting); *Herskovits,* 664 P.2d at 487 (Pearson, J., concurring); *see also* Mangan, *supra,* at 293; King, *supra,* at 1378.

[¶ 14.] Loss of chance developed in response to the traditional standard of proof of causation. Mangan, *supra,* at 285. Normally, a plaintiff is required to show by a preponderance of the evidence that the defendant's actions proximately caused the injuries suffered:

"The term 'proximate cause' contemplates an immediate cause which, in natural or probable sequence, produces the injury complained of. This excludes the idea of legal liability based on mere speculative possibilities or circumstances and conditions remotely connected to the events leading up to an injury."

This Court further stated in *Mulder* that for proximate cause to exist, "the defendant's conduct [must have] such an effect in producing the harm as to lead reasonable men to regard it as a cause" of the plaintiff's injury. 85 S.D. at 549, 186 N.W.2d at 887. Appellant has the burden of establishing that there is sufficient evidence for the factfinder "to reasonably conclude, without resort to speculation, that the preponderance favors liability. As such, [appellants are] not required to prove [their] case to a degree of absolute certainty." *Engberg v. Ford Motor Co.,* 87 S.D. 196, 202, 205 N.W.2d 104, 107 (1973).

*Leslie v. City of Bonesteel,* 303 N.W.2d 117, 119 (S.D.1981) (quoting *Mulder v. Tague,* 85 S.D. 544, 549, 186 N.W.2d 884, 887 (1971) (citations omitted)). Typically, unless the plaintiff can attribute more than a 50% probability of causation to the defendant's negligence, he fails to meet his burden of proof. Thus, if a plaintiff can only

---

5. *Cooper* has since been overruled by the Ohio Supreme Court in *Roberts v. Ohio Permanente Med. Group, Inc.,* 76 Ohio St.3d 483, 668 N.E.2d 480 (1996). Ohio now recognizes the loss of chance doctrine.

6. Mangan and Keith identified approximately nineteen states that have accepted the loss of chance doctrine. *See* Mangan, *supra,* at 290 n. 117; Keith, *supra,* at 770 n. 64. Notable among those jurisdictions adopting the doctrine is Iowa, in *DeBurkarte v. Louvar,* 393 N.W.2d 131 (Iowa 1986).

show a 49% or less chance that the defendant's actions caused his injury, he is foreclosed of all recovery. Conversely, if he can show a 51% or better chance that the defendant caused his injuries, he can recover 100% of the value of such injuries. Because of perceptions that the all-or-nothing approach of the traditional standard of proof of causation was unduly harsh, the loss of chance doctrine evolved.[7]

[¶ 15.] Courts that adopt the loss of chance doctrine in effect recognize a lost chance as a distinct cause of action, treating it as the compensable injury, not the underlying injury itself. *DeBurkarte*, 393 N.W.2d at 137; *Herskovits*, 664 P.2d at 487 (Pearson, J., concurring); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 41, at 45 (5th Ed.Supp. 1988). The following excerpt provides a concise illustration of the loss of chance concept:

[S]uppose that evidence offered at trial tends to show that plaintiff's decedent, having contracted a form of cancer, had a 40% chance of cure and that defendant physician's negligent failure to make a correct diagnosis on first visit reduced the chance of cure to 25%. In such a case, if we view the "death" of plaintiff's decedent, or even "death from cancer," as the relevant event, plaintiff's evidence falls short of supporting a fact finding that the negligence was, more probably than not, a but-for cause of that event. More probably than not, it would have happened anyway because of the cancer. One ground for criticism of this outcome is that it does not take adequate account of the fact that in all cases death is even more certain than taxes. Only the time and cause of death may be in doubt. If evidence supports a finding that, more probably than not, negligence hastened death, ordinarily a wrongful death action lies. Should an action lie, also, when evidence supports a finding that, more probably than not, negligence reduced the patient's chance of survival? Expressed another way, the question is: should we view reduction of the patient's chance of survival as the relevant event, and allow recovery if more probably than not negligence was a cause of that event?

Keeton et al., *supra*, § 41, at 272 (5th Ed.1984) (footnotes omitted). Concomitant with recognizing the lost chance as an interest worthy of redress, the doctrine bifurcates the tort elements of causation and valuation. *See* King, *supra*, at 1389, 1363 (stating that "[a]s has already been argued, causation and valuation are analytically different concepts. The causation inquiry determines *whether* a defendant should be required to compensate a plaintiff for a loss. The valuation inquiry determines *how much* compensation is required," and "[t]his distinction seems to have eluded the courts, with the result that lost chances in many respects are compensated either as certainties or not at all.") (emphasis in original).

[¶ 16.] As a distinct cause of action, the loss of a chance must still be proven under the traditional standard of proof. That is, the plaintiff must still prove by a prepon-

---

7. As proffered by Professor King:

The adoption of the all-or-nothing approach to the loss of a chance has the obvious effect of enhancing the importance of the standard of proof, which determines the degree of certainty with which the party with the burden of proof must satisfy that burden in order to prevail. Perhaps for this reason, when results under the all-or-nothing rule have appeared too harsh to courts, attention has generally focused on the standard of proof as the appropriate doctrine for reformulation.

. . . .

Attempts to deal with the problem posed by the destruction of a chance by tinkering with the standard of proof can only further confuse matters of loss assignment. If the law on this question is to be rationalized, a vehicle other than the standard of proof will have to be used. The appropriate vehicle is a reevaluation of the traditional ways of thinking about the interest for which relief is sought and the role of chance in valuing that interest.

King, *supra*, at 1366, 1370 (footnote omitted).

derance of evidence that the defendant's conduct operated to reduce his chance of a more favorable outcome. Once causation is proven under the traditional standard, a value must be placed on the loss of the chance. For purposes of valuation, the loss of chance doctrine recognizes and compensates possibilities as well as probabilities. Consider the following from Professor King:

Rejection of the all-or-nothing approach to valuing the loss of a chance does not necessarily affect the continuing validity of the all-or-nothing rule for the causation inquiry. Thus, while the loss of a not-better-than-even chance of avoiding some adverse result should be a compensable loss, it still must be established that the defendant caused the destruction of that chance. The all-or-nothing principle would ordinarily still operate in the causation inquiry even if it were abandoned for the purposes of valuing a lost chance.

To illustrate, assume that a patient suffering from cancer is killed because a surgical instrument fails due to errors in the manufacturing process. Assume that the chance that the patient would be cured of cancer was only 30%. Under the approach proposed in this article, the loss of that chance would be compensable. But if it did not appear more likely than not that the defendant was the manufacturer of the instrument, the plaintiff would ordinarily be denied recovery for that loss. In other words, proof of a not-better-than-even chance that the defendant caused the loss of the chance of a cure would not suffice. If, however, the plaintiff proved that the defendant was probably the source of the product and thus the cause of the loss, the plaintiff might recover the value of the loss. Thus, the all-or-nothing idea may continue to be applied to causation even if it is abandoned for the purposes of valuation.

King, *supra*, at 1394–95 (footnote omitted).

[¶ 17.] A review of the cases and commentary on the subject persuades us to conclude that a loss of chance is an actionable injury in our state. Adoption of the loss of chance doctrine properly balances the competing concerns of a patient who receives negligent treatment, against those of the doctor who practices in the inherently inexact science of medicine. Properly applied, the loss of chance doctrine does not alter or eliminate the requirement of proximate causation. Rather, a plaintiff must still prove by a preponderance of evidence, or more likely than not, that the defendant's actions reduced her chance of a better outcome. The key to a successful application of this doctrine is recognizing and valuing the lost chance as the compensable injury, not the underlying injury itself. Furthermore, although the doctrine relies on statistical evidence in order to assign a value to the lost chance, such use of mathematical calculations is already necessary under the traditional standards of causation and valuation. As Professor King points out, "How else . . . do we even know whether we are talking about a better-than-even chance when applying the all-or-nothing rule?" King, *supra*, at 1385.

[¶ 18.] Nor should we reject the doctrine simply because it ostensibly places medical malpractice on a different plane of liability compared to other types of malpractice. The fact that the doctrine has thus far only been applied in a medical malpractice context in all likelihood derives from the availability of statistical probabilities in the field of medical science; such information is not widely available in other malpractice contexts. *See* King, *supra*, at 1386 n. 111.

[¶ 19.] Finally, the medical profession's fears of increased malpractice litigation as a result of this doctrine are unfounded. Adopting loss of chance will not denigrate rural South Dakota medical care, as the dissent bleakly forecasts. Our current medical malpractice regime expects that any physician, rural or urban, who is uncertain about his ability to treat a patient's condition will refer the patient to another

who is more skilled or experienced. If the doctor fails to do this, and the patient loses a chance at recovery, then he should be liable for medical malpractice. Whether medical care is administered in a rural or urban setting, among the latest technology or with the most primitive of instruments, a patient still has the right to expect competence in his physician's care. As has been with past medical malpractice situations, an error in judgment will not create liability. *See* Mangan, *supra*, at 325. The loss of chance doctrine is tied to the physician's negligence, not the location of his office or whether it is chock-full of technology. Importantly, the doctrine prevents a physician from concealing his negligent actions in cases where the likelihood of recovery was initially less than 50% even under optimal conditions; a doctor should not be allowed to escape with impunity if his negligent acts lowered the chances even further.

 [¶ 20.] A crucial aspect of recognizing lost chance as a compensable injury is the idea that a physician should be subject to liability only to the extent that he contributed to the harm. Therefore, the amount of damages recoverable under such an action should be equal to the percent of chance lost multiplied by the total value of a complete recovery. *McKellips v. Saint Francis Hosp., Inc.,* 741 P.2d 467, 476–77 (Okla.1987). This approach to valuing lost chance was proffered by Professor King in his article, *supra*, at 1382, and has been adopted by a number of other jurisdictions. *See DeBurkarte,* 393 N.W.2d at 137; *Aasheim v. Humberger,* 215 Mont. 127, 695 P.2d 824,

828 (1985); *Roberts,* 668 N.E.2d at 484; *McKellips,* 741 P.2d at 476.[8]

 [¶ 21.] Here, the record contains an affidavit from Dr. Mark E. Rupp, an infectious disease specialist from Omaha, Nebraska. After reviewing Jorgenson's medical records and the deposition of another medical expert in the case, Rupp testified:

> That based upon your Affiant's review of these documents and your Affiant's education, training and experience as an infectious disease physician, it is your Affiant's opinion within a reasonable degree of medical certainty or probability, that because infection was not timely diagnosed and treated, Mr. Jorgenson lost a chance to prevent the subsequent outcome or amputation of his right lower extremity.

[¶ 22.] Vener's motion for summary judgment was supported by transcripts of depositions from two other medical experts. One expert initially testified that he could not express an opinion about whether a referral to an infectious disease specialist early in the treatment process would have saved Jorgenson's leg. Later on cross-examination, he stated that had the infection been treated earlier, he believed there would have been a better chance at saving the leg. He then clarified these seemingly inconsistent statements by testifying that had Jorgenson been under his charge, he would have changed the treatment regimen, but that still might not have saved Jorgenson's leg.

[¶ 23.] Dr. Vener's other medical expert testified that in his opinion a referral to an infectious disease expert would not have

8. The patient's task under the loss of chance doctrine as now adopted in South Dakota would be to first prove that the physician's conduct caused the loss of the chance by a preponderance of the evidence. Once causation has been established, the value of the injury, whether a possibility (less than 50%) or a probability (greater than 50%), is compensable. Assuming, for example, that a patient had a 40% chance of recovery under optimal conditions, and the physician's negligence destroyed that chance, the value of the lost chance would be 40% of the total value of a complete recovery. Similarly, if the patient's chance at recovery was 60% and the physician's negligence eliminated that chance, the value of the lost chance would be 60% of the value of a complete recovery. Or, if instead of completely eliminating the chance of recovery, the physician's negligence merely reduced the chance of recovery from 40% to 20%, then the value of the lost chance would be 20% of the value of a complete recovery.

saved Jorgenson's leg, and that there was no breach in the standard of care by Dr. Vener. Included in the record was an excerpt from a medical reference book, which generally stated that injuries such as Jorgenson's were difficult to treat. According to the reference book, the ultimate outcome in a certain percentage of such cases was amputation.

[¶ 24.] Reviewing the evidence in a light most favorable to Jorgenson, a genuine issue of material fact exists whether Vener's negligence caused the loss of a chance to save the leg. One expert testified that Vener caused a loss of the chance to save Jorgenson's leg, another testified exactly the opposite, and a third was ambivalent. These disputes of fact cannot be properly disposed via summary judgment and must be resolved by the factfinder. Thus, summary judgment was improper, and the trial court's decision must be reversed.

[¶ 25.] Reversed and remanded.

[¶ 26.] SABERS and GILBERTSON, Justices, concur.

[¶ 27.] AMUNDSON, Justice, concurs specially.

[¶ 28.] KONENKAMP, Justice, dissents.

AMUNDSON, Justice (concurring specially).

[¶ 29.] I agree with the majority in adopting the lost chance doctrine for reasons as expressed by the Kansas Supreme Court in *Roberson v. Counselman*, 235 Kan. 1006, 686 P.2d 149 (1984). In *Roberson*, the court concluded that by not allowing the plaintiff's case to go forward,

> in essence, declares open season on critically ill or injured persons as care providers would be free of liability for even the grossest malpractice if the patient had only a fifty-fifty chance of surviving the disease or injury even with proper treatment. Under such rationale a segment of society often least able to exercise independent judgment would be at the mercy of those professionals on whom it must rely for life-saving health care.

*Id.* at 160.

[¶ 30.] The Kansas Supreme Court again addressed this doctrine in *Delaney v. Cade*, 255 Kan. 199, 873 P.2d 175 (1994) in deciding whether or not this doctrine should apply to lost chance of recovery. The court held that it did and stated:

> Although a variety of approaches has emerged among jurisdictions which have examined the loss of chance theory, three general approaches are utilized by courts confronted with the theory and the standard of proof to be adopted: (1) the all or nothing approach; (2) the relaxed standard of proof approach; and (3) the any loss of chance approach.

> The all or nothing approach, or traditional approach, is that approach followed by jurisdictions which refuse to recognize the "lost chance" as a distinct and compensable injury. These jurisdictions, which are now probably the minority, strictly adhere to the principle that the plaintiff must prove that the defendant's negligence was the proximate cause of the injury or death suffered by the plaintiff. As such, the plaintiff must establish that there existed a better-than-even chance of avoiding the physical injury or resulting death. If the plaintiff meets this burden, compensation is awarded for the particular injury or wrongful death suffered, not the lost chance of a better recovery or survival. Thus, these jurisdictions refuse to relax the traditional view of proximate cause in medical malpractice actions. As pointed out in *Roberson*, this argument is best illustrated in *Cooper v. Sisters of Charity*, 27 Ohio St.2d 242, 272 N.E.2d 97 (1971). As the all or nothing (traditional) approach is nothing more than a rejection of the loss of chance theory, which we have already determined is applicable in Kansas, further consideration of the traditional standard of proof would be irrelevant.

The relaxed standard of proof approach, commonly referred to as the "substantial chance" approach, requires plaintiff to present evidence that a substantial or significant chance of survival or better recovery was lost. If plaintiff meets this initial threshold, the causation issue is submitted to the jury, using the traditional proximate cause standard to ascertain whether, in fact, the alleged malpractice resulted in the loss of a substantial or significant chance. Thus, the jury must find by a preponderance of the evidence that the alleged negligence was the proximate cause of the lost chance, but the lost chance itself need only be a substantial or significant chance, for a better result, absent any malpractice, rather than a greater than 50 percent chance of a better result. *Id.* at 183–84.

[¶ 31.] This Court should also adopt this substantial chance approach to determine whether a plaintiff should be compensated and the amount of any compensation based on what they lost by being deprived of the opportunity to receive early treatment and the chance of realizing gain in avoiding physical harm or loss of life. This approach only provides that an individual is responsible for their part of the resulting damages.[9] A percentage valuation and an assessment of damages for a lost chance of survival does not over compensate an injured party, nor does it unfairly make the defendant responsible for fault unattributable to that specific defendant.[10]

---

**9.** The loss of chance should limit exposure to fault attributable to the defendant. This apportionment of fault was discussed in *Delaney*. In *Delaney*, the court stated:

"Application of the lost chance principle in medical malpractice cases often involves circumstances where the plaintiff or patient was already suffering from some disease or disorder at the time the health care malpractice occurred. *Consequently, the loss of chance doctrine serves to fairly compensate the plaintiff for the tortious deprivation of an opportunity to live longer and recover from a physical injury or condition inflicted by the defendant's wrongful act or omission.* In the medical malpractice context, lost

KONENKAMP, Justice (dissenting).

[¶ 32.] Today's decision unfairly targets the medical profession by needlessly creating a new formula to expand damage awards and a new class of plaintiffs to sue for them. The hallmark of every notable decision signaling a profound change in the law is a serious injustice that would otherwise go unrelieved. This case, however, offers a poor prototype for the sweeping changes in medical malpractice liability the Court now instigates. Under the common law process, in areas legislation has yet to control, the courts may advance the law to fashion civil remedies. SDCL 1–1–24. But as Professor Llewellyn once expressed, "conscious reshaping must so move as to hold the degree of movement down to the degree which need truly presses." Karl N. Llewellyn, The Bramble Bush 156 (1930). If a need exists at all, let it be shown in the facts of a case and in the absence of current law to offer a sufficient redress. Whatever pressing need might be unfilled here, the plaintiff has utterly failed to show it.

### 1. No Facts Support Changing Medical Malpractice Law

[¶ 33.] Parties opposing summary judgment must meet fact with fact, demonstrating that genuine issues remain for trial. SDCL 15–6–56(e). Curiously, the plaintiff's appellate briefs contain no facts. None. Perhaps this is no oversight, though

chance endeavors to allow a plaintiff to recover for the diminished chances of surviving or recovering from a disease or malady which results from the health care defendant's malpractice."
873 P.2d at 182 (quoting Keith, *Loss of Chance: A Modern Proportional Approach to Damages in Texas*, 44 Baylor L.Rev. 759, 760 (1992)) (emphasis in original).

**10.** Attached to this writing are copies from the pattern instructions of Kansas 123.22 and 181.06 which deal with this doctrine. These attachments are provided only to assist the trial court in finalizing the jury instructions to be given at a later date.

it is a violation of our rules. *See* SDCL 15–26A–60(5). Instead, the plaintiff's argument consists of an abstract discussion on the merits of adopting a new rule for imposing additional liability on the medical profession. Thus, we are urged to approve the lost chance theory and radically transform medical malpractice law in South Dakota seemingly as a matter of progressive policy, as if the facts should make no difference.

[¶ 34.] In examining the record, nothing emerges to justify creating a new and exceptional way to recover damages against medical providers. Nonetheless, the Court chooses a single sentence out of the entire record for its reason to remake the law. In an affidavit submitted by Dr. Rupp of Nebraska, he opines that Jorgenson "lost a chance to prevent the subsequent outcome or amputation of his right lower extremity." What chance? A substantial chance, an even chance, a miniscule chance? Rupp's affidavit offers naught. In oral argument, however, Jorgenson's counsel repeatedly admitted, "We cannot prove a percentage of damages." Indeed, counsel argued for full compensation if any chance, no matter how small, was lost because of negligence: "It would not be worth it," he said, to seek only a percentage. Thus the theory this Court adopts is not the one the plaintiff espouses. Even so, counsel supposed that if the Court nonetheless remanded the case for trial on the lost percentage theory, counsel will "find someone" to testify on percentages. Surely, reversing summary judgment on a promise to find more evidence is without precedent.

[¶ 35.] Jorgenson himself elected to amputate rather than take prolonged treatment to heal his leg. He chose amputation although his doctors at the Myo Clinic told him he had a sixty percent chance of saving it. Now, he will seek compensation not for his lost leg, but for the percentage probability he had of saving it while in the care of his former doctor, before he went to the Mayo Clinic. If this seems legally insubstantial and illusory, imagine what a jury will strain to make of it. Most courts that apply this theory hold that to be accurately valued the lost chance must be substantial, identifiable, and quantifiable, without resort to conjecture or speculation. *Fennell v. Southern Maryland Hosp. Center, Inc.*, 320 Md. 776, 580 A.2d 206, 212 (1990) (citation omitted). With the admitted lack of expert evidence on what chance existed, it makes no sense to order the trial judge to submit this case to a jury. How this can meet the *Daubert* standard is mystifying. *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *see also Rogen v. Monson*, 2000 SD 51, ¶¶ 26–28, 609 N.W.2d 456, 462–63 (Konenkamp, J., concurring). If the members of this Court are determined to adopt the lost chance theory, they should wait at least until a case arrives to justify it.

## 2. Changes in Doctrine Should Await a Demonstrated Need

[¶ 36.] In keeping with the principles of judicial restraint, adopting or rejecting this new tort should await the case that truly calls it into issue. To confer this theory with premature lodgment in our state only encourages frivolous and costly experimentation in our courts. When the appropriate time comes, we should carefully consider all the advantages and disadvantages. Here, the Court generally discusses both sides of the question, but without weighing South Dakota's specific circumstances. Even if the facts support a new rule, adopting it presents serious questions for the people of this state. Societal costs and potential for unfairness resulting from expanded liability against a particular segment of the economy, present real problems. *See Fennell*, 580 A.2d at 214 (quoting *Gaver v. Harrant*, 316 Md. 17, 557 A.2d 210, 217 (1989)).

[¶ 37.] South Dakota assuredly retains significant health care concerns. For instance, the more populous areas seem to have adequate numbers of medical provid-

ers, but many of our state's small communities have no doctors at all. The cost for maintaining them is simply too high. Some rural communities rely on physician assistants, nurse practitioners, and other medically trained people. They too will be subject to extended liability under the broad new rule the Court creates today. What will it cost our small communities?

[¶ 38.] Rural medical providers will be liable for increased damages the same as their larger community counterparts, even though rural medicine is severely constrained by economics in the availability of such things as the latest diagnostic equipment. Emergency providers in rural areas may be particularly vulnerable. Deciding whether to treat immediately or stabilize for transport a critically ill patient can be easily second-guessed, especially when the patient's chances are precarious even in the best of circumstances. Although our Court gives little regard to such worries, other courts lend more weight to this reality. In rejecting the loss of chance theory, an Alaska court considered the adverse affect on rural medical care, writing, "the adoption of any version of 'loss of chance' seems particularly ill-suited to a state like Alaska where medical care must be delivered in remote locations...." *See Crosby v. United States*, 48 F.Supp.2d 924, 932 (D.Alaska 1999) (listing the advantages and disadvantages of the lost chance theory).

[¶ 39.] Deciding whether to widely expand liability against members of the medical profession invokes serious policy concerns, perhaps more properly resolved by our Legislature. *Fennell*, 580 A.2d at 214. Courts should give "appropriate deference to legislative action embracing policy goals and initiative." *Crosby*, 48 F.Supp.2d at 930. The *Crosby* court, in deciding whether a claim for loss of chance could be maintained in a medical malpractice action under Alaska law, stated that the doctrine "involves significant and far-reaching policy concerns affecting the quality and cost of health care...." *Id.* at 931. Such

questions, the court determined, are best left to the Legislature to address and resolve, as that forum is equipped to conduct hearings, collect data, analyze the competing concerns, and make more informed decisions.

[¶ 40.] The prospect of increased costs to the consumer cannot be discounted. It seems naïve to suggest that creating a new cause of action and an additional way to recover damages where none could be recovered before will not increase claims. The likely effect of this new theory will be higher malpractice insurance premiums, which in turn translate into higher costs for health care with the danger of losing vital health services where they are most needed. In *Knowles v. United States*, 1996 SD 10, ¶ 60, 544 N.W.2d 183, 196, we acknowledged our Legislature's grave concern "about the availability and cost of health care, especially in rural areas and small communities." "Seeing a direct correlation between the availability of health services and skyrocketing medical malpractice insurance premiums," the Legislature enacted a damages cap. *Id.* That these concerns persist is shown in the fact that after our decision in *Knowles* holding the former damages cap unconstitutional, the Legislature reenacted a damages cap in 1997. *See* SDCL 21-3-11.

[¶ 41.] This Court writes that the loss of chance doctrine has so far been applied only to medical malpractice situations and that most likely this is because statistics and probabilities in medicine are not as widely available in other types of malpractice. Yet we must be prepared to consider the expansion of this rule to other forms of professional malpractice. It seems almost discriminative to suggest, as some courts have, that only doctors, nurses, and their colleagues in the medical field should stand subject to greater liability for their errors. In fairness, "it is doubtful that there is any principled way we could prevent its application to similar actions involving other professions." *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 406 (Tex.1993).

[¶ 42.] To be sure, the present system has its flaws. As the Court points out, a doctor's negligence goes unrecompensed if a patient's chance of recovery was less than fifty percent. Our statutes do not explicitly foreclose the lost chance theory. Plaintiffs may recover "for all the *detriment* proximately caused" by negligence, which might arguably include the loss of a chance to recuperate. SDCL 21–3–1 (emphasis added). But the Court's solution provides no panacea. In fact, it may only multiply injustice. The *Fennell* opinion used this apt example:

> [A]ssume a hypothetical group of 99 cancer patients, each of whom would have had a 33 1/3% chance of survival. Each received negligent medical care, and all 99 died. Traditional tort law would deny recovery in all 99 cases because each patient had less than a 50% chance of recovery and the probable cause of death was the pre-existing cancer not the negligence. Statistically, had all 99 received proper treatment, 33 would have lived and 66 would have died; so the traditional rule would have statistically produced 33 errors by denying recovery to all 99.
>
> The loss of chance rule would allow all 99 patients to recover, but each would recover 33 1/3% of the normal value of the case. Again, with proper care 33 patients would have survived. Thus, the 33 patients who statistically would have survived with proper care would receive only one-third of the appropriate recovery, while the 66 patients who died as a result of the pre-existing condition, not the negligence, would be overcompensated by one-third. The loss of chance rule would have produced errors in all 99 cases.

580 A.2d at 212. Such concerns have caused a considerable number of jurisdictions to reject this theory. *See, e.g., United States v. Cumberbatch,* 647 A.2d 1098 (Del.1994); *Gooding v. University Hosp. Bldg. Inc.,* 445 So.2d 1015 (Fla.1984); *Manning v. Twin Falls Clinic & Hosp., Inc.,* 122 Idaho 47, 830 P.2d 1185 (1992); *Fennell,* 320 Md. 776, 580 A.2d 206; *Fabio v. Bellomo,* 504 N.W.2d 758 (Minn.1993); *Ladner v. Campbell,* 515 So.2d 882 (Miss. 1987); *Pillsbury–Flood v. Portsmouth Hosp.,* 128 N.H. 299, 512 A.2d 1126 (1986); *Kramer,* 858 S.W.2d 397.

[¶ 43.] Professor King, whose percentage recovery scheme this Court embraces today, describes his theory as akin to suing on a lost "raffle ticket." Perhaps that is a fitting analogue. But should our laws function on the values that govern lotteries? *See Falcon v. Memorial Hosp.,* 436 Mich. 443, 462 N.W.2d 44, 58–68 (1990) (Riley, C.J., dissenting). For South Dakota, this is no simple question. We are premature in approving the loss of chance theory. A decision should await the proper case before accepting or rejecting it.

### 123.22 LOSS OF CHANCE—BETTER RECOVERY—CAUSATION

The plaintiff has claimed that (he)(she) was denied a substantial chance for better recovery due to the fault of the defendant. Before you can find the defendant to be at fault, you must find:

1. That _____ would have had a substantial chance for better recovery if the _____ had been (diagnosed)(treated) in a timely manner and under the applicable standard of care;

2. That the defendant failed to (diagnose) (treat) _____ (in a timely manner) (under the applicable standard of care); and .

3. That the resulting injury or lessened degree of recovery suffered by _____ as a result of defendant's failure was substantial.

A "substantial chance for better recovery" is one which is capable of being estimated, weighed, judged, or recognized by a reasonable mind. As used in this instruction, a "substantial factor" must be distinguished from a factor which had a merely negligible effect in causing _____'s injury.

## 181.06 VERDICT FORM—LOSS OF CHANCE ISSUE—BETTER RECOVERY

We, the jury, present the following answers to the questions submitted by the court:

1. Do you find _____ was denied an appreciable chance for better recovery due to the fault of the defendant?

 _____ Yes _____ No

[Proceed to question 2 and following questions only if you answered "yes" to question 1.]

2. What do you find, as a percentage of one hundred (100), were _____'s chances for better recovery, if (he) (she) had received proper medical care? _____%

3. What do you find, as a percentage of one hundred (100), were _____'s chances for better recovery under the care actually given? _____%

4. Without considering your answers under any of the above questions, proceed to determine the damages sustained by _____.

 | | |
 |---|---|
 | A. Noneconomic loss to date | $_____ |
 | B. Future noneconomic loss | $_____ |
 | C. Medical expenses to date | $_____ |
 | D. Future medical expenses | $_____ |
 | E. Economic loss to date | $_____ |
 | F. Future economic loss | $_____ |
 | **TOTAL DAMAGES** | $_____ |

5. Our finding of monetary damages for noneconomic loss stated in paragraphs 4A and 4B includes $_____ for pain and suffering.

Agreement on each of the above questions was by ten or more jurors.

Yes _____ No _____

_____
Presiding Juror